Herman J. HERKERT, Plaintiff-Respondent,

v.

Robert STAUBER, William Mazer, Richard Mazer, Mazer-Stauber Associates, P.C., and Guardian Corporation, Defendants-Appellants-Petitioners.†

Supreme Court

*No. 80–816.  Argued March 1, 1982.—Decided March 26, 1982.*

(Also reported in 317 N.W.2d 834.)

† Motion for reconsideration denied, with costs, on May 3, 1982. CECI, J., took no part.

For the defendants-petitioners there were briefs by *David M. McDorman* and *John Kasimatis Law Offices* of Madison, and oral argument by *Mr. McDorman.*

For the plaintiff-respondent there was a brief by *Richard H. Porter* and *Foley & Lardner* of Milwaukee, and oral argument by *Mr. Porter.*

COFFEY, J.  This is a review of a decision of the court of appeals affirming a judgment of the circuit court for Dane county, WILLIAM F. EICH presiding. The judgment awarded Herman J. Herkert, the plaintiff-respondent, $50,400 in a breach of a contract action

concerning a certain contract between himself and Mazer-Stauber Associates, P.C., defendants-appellants-petitioners, for the construction of housing units for the elderly. After trial, the jury returned a verdict finding that Mazer-Stauber Associates, P.C., and Guardian Corporation breached the contract with respect to their obligation to secure approval from the Farmer's Home Administration (FmHA) for financing and awarding damages of $7,500. In a memorandum decision on motions after verdict, the trial court increased the $7,500 damage figure to $50,400 holding that these damages were proven as a matter of law and entered judgment against the defendants, both corporate and individual. The defendants appealed alleging three errors, the trial court's refusal to instruct the jury concerning frustration of purpose; the determination of damages as a matter of law; and the entry of judgment against the individual defendants. The appellate court affirmed holding that the defendant's failure to raise their arguments with respect to the frustration of purpose instruction and the determination of individual liability before the trial court constituted a waiver of their right to raise these issues on appeal. Further, the appellate court approved the trial court's increase of the damage award as a matter of law.

Mazer-Stauber Associates, P.C. (M-S Associates) entered into a contract with Herkert, agreeing to design and build an 8-unit apartment building for Herkert on designated land in Poynette, Wisconsin. Herkert testified that he had become interested in the housing project as a result of the promotional efforts of William Mazer, a representative of M-S Associates.

Robert Stauber and Richard Mazer, both architects, formed M-S Associates as a Michigan professional service corporation and hired William Mazer, a nonarchitect, as a promotional employee. The construction con-

tract entered into between Herkert and M-S Associates was dated and signed by Robert Stauber as president of M-S Associates on September 17, 1975.

The construction contract recited that the housing project would be financed through a long-term, low interest loan from the Farmers Home Administration (FmHA) of the United States Department of Agriculture and further, it expressly provided that the construction contract would become null and void should M-S Associates be unable to obtain an FmHA loan on Herkert's behalf or other satisfactory construction financing. Among the contractual obligations of M-S Associates was the responsibility to provide "the general design criteria, architectural, engineering and construction drawings and necessary documents and information" required for a complete application for financing. The total cost of the construction project exclusive of the land was not to exceed $115,000.

Prior to the formal execution of the contract on September 17, 1975, the parties made last minute additions thereto which they have referred to as "addendums."[1] Three such "addendums" were attached to the contract and each was dated and signed by William Mazer and Herman Herkert on September 16, 1975. One of these additions to the contract purported to obligate M-S Associates to sell the land on which the project was to be built to Herman Herkert for the price of $8,000. The addendum also gave Herkert an option to purchase an adjacent parcel of land for an additional $8,000. An-

---

[1] The parties to the contract have labeled these additions to the contract as addendums although they were dated and allegedly signed prior to the execution of the contract itself. While the term "addendum" is generally used to refer to changes made *after* the execution of the contract, for the sake of convenience and so that our terminology is consistent with the contract, we have adopted the parties' use of the term in this opinion to refer to the additions made to the contract.

other of the additions to the contract guaranteed that Herkert's total out-of-pocket expenses for the building construction and purchase of land would not exceed $123,000. The addendum also represented that upon completion of the project, Herkert would receive $2,900 annually from the rents collected which amount the parties referred to as a "cash flow." At trial, conflicting testimony was presented concerning the date on which the addendums were actually signed and whether William Mazer had the authority to enter into the addendums on behalf of the corporation. Additionally, the trial testimony was inclusive as to whether either Richard Mazer or Robert Stauber knew that the addendums were added to the contract.

On September 18, 1975, M-S Associates filed a portion of the "pre-application" form for FmHA financing on behalf of Herkert. Shortly after the partial "pre-application" form was submitted to the FmHA, Robert Stauber resigned from M-S Associates and the corporation ceased the active practice of architecture and the former business remained only as a registered corporate entity. The responsibility for the Herkert contract was then transferred to the newly formed Guardian Corporation, with William Mazer as its president and his brother, Richard Mazer, as vice-president. Guardian Corporation continued to prepare and file the necessary documents for the FmHA loan and on January 14, 1977 the FmHA gave a preliminary concurrence on the "pre-application" form on file.

In March of 1977, FmHA advised the Guardian Corporation of an opportunity to utilize multiple funding for the apartment project by combining the resources of the Department of Housing and Urban Development (HUD) with those of the FmHA to finance an expanded 16-unit housing project rather than the 8-unit project previously agreed upon and on the drawing board. The Guardian

Corporation informed Herkert of the availability of this type of financing and Herkert consented to alter his original loan application from FmHA financing alone to joint HUD-FmHA financing. The Guardian Corporation notified the FmHA of their change of plans from an 8-unit to a 16-unit project and the corresponding change in the type of financing being sought. The same local FmHA office which handled the original pre-application for singular FmHA financing processed the application for the joint HUD-FmHA financing.

As a result of the parties seeking the combined HUD-FmHA financing, they were required to fulfill several additional procedural requirements which were not necessary for approval of the original FmHA financing. One of the more significant new requirements was the need to obtain a letter of approval for the 16-unit (HUD-FmHA) apartment project from the mayor or village president of the community in which the project was to be built. Guardian Corporation informed the FmHA that the approval it had requested for the project from the village council of Poynette and its president had been denied. The Guardian Corporation viewed this decision on the part of the village of Poynette authorities as a death blow to the 16-unit joint HUD-FmHA housing project and, thus, it proceeded no further on the Herkert project.

Some three and one-half months thereafter, on August 5, 1977, the FmHA informed Herkert by letter that the department would consider its file on his loan application inactive and informed him that unless action was taken on the application within fifteen days of that date, the application would be considered withdrawn. Herkert forwarded this letter to the Guardian Corporation and they failed to respond to the FmHA letter or take any other action. The FmHA, on August 20, 1977, closed its file on the Herkert application.

At trial, Herkert and William Mazer presented conflicting testimony concerning the question of whether Herkert and the Guardian Corporation had agreed to abandon their application for an FmHA loan. It should be pointed out that community approval was not a requirement for the original 8-unit FmHA project and testimony presented at trial established that the Herkert application for an FmHA loan could have been renewed at anytime.

On April 6, 1978, Herkert commenced this breach of contract action alleging that M-S Associates and the Guardian Corporation had failed to complete the construction project and had breached the construction contract by failing to provide all necessary documents required to complete the application for an FmHA loan and by failing to sell the parcel of land to the plaintiff on which the project was to be built. Herkert also alleged that defendants, Robert Stauber, William Mazer and Richard Mazer, were jointly and severally liable for the breach of contract as the contract was for the rendition of professional services.

After trial, the jury returned a verdict finding that the defendants, M-S Associates and the Guardian Corporation had breached the contract with respect to their obligations to secure FmHA financing for the project and awarded $7,500 in damages therefor. The plaintiff filed a motion after verdict requesting that the court change the damage award to $50,800 alleging that these damages were proven as a matter of law and requested judgment on the modified verdict. The plaintiff also requested in general language that the trial court enter judgment against "the defendants." Defendant Robert Stauber filed a motion in opposition to the plaintiff's motion alleging that there was insufficient evidence to sustain the jury's damage award and requested that the trial court reduce the damage figure to zero as the trial

testimony on damages was insufficient to support the jury's damage award. In the alternative, Stauber requested that the trial court order a new trial on the issue of damages alone.

In a memorandum decision on the motions after verdict, the trial court agreed with the plaintiff and increased the damage award to $50,400 holding that those damages were proven as a matter of law. The trial court also ordered that judgment be entered against the individual defendants, jointly and severally, without reciting any factual basis or legal authority for the decision to impose personal liability.

The defendants[2] appealed and the appellate court affirmed holding that by failing to raise the alleged errors before the trial court on motions after verdict, the defendants waived their right to object to the failure of the trial court to instruct the jury on the question of frustration of purpose and to the failure to submit a verdict question on the apparent authority of William Mazer to bind the corporation to the addendums. The appellate court also held that the defendants had waived their objection to the imposition of individual liability again by failing to raise this issue before the trial court on motions after verdict. The court of appeals agreed with the trial court's determination that the $50,400 damages were established as a matter of law.

---

[2] The court of appeals determined that because of the wording of the notice of appeal the parties had only appealed the judgment entered against Robert Stauber. We hold that this determination was erroneous as a review of the entire notice of appeal demonstrates that all of the named defendants were appealing from the "whole of the Final Judgment" entered against all of the defendants. Because the appellate court proceeded to consider all of the arguments raised by each of the defendants, however, we hold that this error on the part of the court of appeals was harmless and nonprejudicial.

The defendants petitioned this court to review the appellate court decision and we granted the defendants' petition, although we decided to exclude the issues relating to the failure of the trial court to give the frustration of purpose instruction and relating the applicability of sec. 805.15(6), Stats. (Excessive or Inadequate Verdicts) from consideration on review.

## Issues

1. Did the lower court err in determining plaintiff's damages as a matter of law?

2. Was it error to grant judgment against the individual defendants?

## Damages

In their motions after verdict, both the plaintiff and the defendants agreed, but for different reasons, that the record failed to substantiate the jury damage award. In its memorandum decision on the motions after verdict the trial court summarized the evidence relating to damages in the following manner:

"The evidence relating to damages may be summarized as follows: Plaintiff testified that under the contract, which was executed in 1975, he was to pay $123,000 for the project—$115,000 for the buildings and $16,000 for the land. As indicated, the project never was constructed. One of plaintiff's witnesses, a real estate appraiser, testified that the value of the subject land as of September 27, 1979, was $24,400.00. A second witness (an architect/engineer/contractor) testified that the present value of the apartments (which were to be a fully-completed, 'turn-key,' project under the contract) would be $161,327.00.

"Using these figures, the difference between plaintiff's 1975 contract price and the present value of the project, had it been built, would be $54,727.00 [(24,400 − 16,000) + (161,327 − 115,000) = 54,727]. After much argument and discussion during the trial, however,

counsel for the defendants stipulated that $20,000 would be the present value of the land, and $156,000 the present value of the buildings. The difference, using these figures would then be $45,000.00 [(20,000 — 16,000) + (156,000 — 115,000) = 45,000].

"In addition, an addendum to the contract recited that plaintiff's 'cash flow' upon completion of the project would be $2900 per year, and this fact was not disputed at the trial. Nor is it disputed that plaintiff paid defendants a retainer of $2500, which has not been returned to him (he declined to accept its return at about the time the action was commenced).

"From the above, it seems clear that defendants elected to base their defense solely on the question of liability; they offered no evidence as to damages, and, in fact, stipulated as to the present value of the project as indicated above."

Based upon this summary of the evidence submitted, the trial court concluded that the jury disregarded the evidence in the record when awarding only $7,500 in damages. Since the evidence was uncontroverted and the damage figures had been stipulated, the court increased the jury's answer in the special verdict question from $7,500 to $50,400. The trial judge's award was computed as follows:

"That figure is arrived at by totalling the figures discussed above in the following manner:

" 41,000.00: Building cost ($156,000) less contract price ($115,000).
" 4,000.00: Present value of land ($20,000) less contract price ($16,000).
" 2,900.00: One year's 'cash flow' as stipulated by counsel.
" 2,500.00: Plaintiff's advance to defendants.

"$50,400.00"

A review of the entire record in this case demonstrates that the trial court's summary of the evidence relating

to damages is correct and, thus, the jury's damage award of $7,500 cannot be supported based upon any reasonable view of the evidence presented at trial. We find no substantiation in the record for limiting the damage award to $7,500. Additionally, the record reflects the lack of any testimony presented to the jury from which they could determine that the figures were inflated and, therefore, ought to be reduced. The defendants' motions after verdict and affidavit in support thereof concedes that there is no support for the jury's $7,500 damage award.

"The jury's answer awarding the sum of $7,500 cannot be supported by the weight of the evidence submitted in the trial by the plaintiff. That there was no evidence submitted by the plaintiff to support a loss of damages in the sum of $7,500.00. That said sum has no relation to the four categories of damages sought by the plaintiff. That the jury's sum is far from the building cost difference argued by the plaintiff. That said sum has no relation to the $2,500.00 retainer, the net cash flow or the appraised depreciation of the parcels. Plaintiff did not submit evidence during the course of the trial on the issue of damages with the exception of the retainer and the building cost difference." Defendants' affidavit in support of motions after verdict.

More than 60 years ago, in the case of *W.H. Shenners Co. v. Delzer*, 169 Wis. 507, 173 N.W. 209 (1919), this court recognized that where a verdict is for a sum less than the successful party is entitled to on undisputed evidence, the court may increase the damages to "conform with the proof" presented at trial.

"How the mistake in the verdict occurred we do not know and it is idle to speculate upon the matter. But since there was no conflict in the evidence upon the subject of damages, placing the cost of the abstract at $21, the court properly corrected the amount thereof to

conform to the proof. *Schweitzer v. Connor,* 57 Wis. 177, 14 N.W. 922; *Schweickhart v. Stuewe,* 75 Wis. 157 (43 N.W. 722) and cases cited on page 160." *Id.* at 508.

The facts of this case resemble those presented in *W.H. Shenners Co. v. Delzer, supra,* as in that case and the case at bar the jury specifically found that the defendants had breached their contract, but then proceeded to assess damages less than those established in the uncontroverted proof presented at trial.

The defendants seek to explain the jury's damage award by arguing that the jury could have determined that the defendants' breach of their obligations to secure FmHA financing was not the sole cause of the housing project failure because if the plaintiff had desired, he might have secured other financing. This argument does not adequately explain the jury's verdict, however, because if the jury had determined that the defendants' breach of their obligations was not the sole cause of the failure to construct the housing project, how did they award any damages to the plaintiff as the record is devoid of any proof establishing any damages other than those resulting from the defendants' failure to complete the construction project. Additionally, we point out that the record is silent as to the availability and feasibility of other satisfactory financing and, thus, in the absence of any evidence supporting this contention, there is no basis for the defendants to argue that Herkert could have mitigated his damages by securing alternative financing.

"An injured party cannot recover any item of damage which could have been avoided. The burden of proof is on the delinquent party to show that the injured party could have mitigated its damages. . . ." *Kuhlman, Inc. v. G. Heileman Brewing Co., Inc.* 83 Wis. 2d 749, 752, 266 N.W.2d 382 (1978).

The record is also devoid of evidence establishing whether Herkert could have found another firm to provide the service of assisting in securing FmHA financing and the additional cost of such services.

In *W.H. Shenners v. Delzer, supra,* the defendants made similar arguments seeking to rationalize the jury's damage award in an amount less than the proven contractual damages by arguing that the jury intended only to give a liberal award for the damages resulting from the breach of one of the contractual obligations, that being the failure to pay for an abstract. The defendants argued that the jury did not intend to award any damages for a remaining contractual obligation to pay a commission for securing an exchange of property. This court rejected this argument holding that the jury "could not properly" ignore the terms of a valid contract in assessing damages.

"Since the general finding in favor of plaintiff negatives fraud and must be sustained, and since the court instructed the jury that in the absence of fraud the defendant must be held to have accepted the plaintiff's offer, the argument that the jury intended to give the plaintiff only a liberal allowance for its services and disbursements in procuring an abstract and nothing for commission fails. The jury could not properly ignore the terms of a valid contract between the parties." *Id.* at 508.

The defendants similarly argue that the jury's damage award in the case at bar was intended only to liberally compensate the plaintiff for one portion of the contract, that being the breach of the obligation to secure FmHA financing and not to compensate the plaintiff for the damages suffered due to the failure to complete the construction project because the jury did not find that the breach solely caused the abandonment of the construction project. We reject this argument of the defendants be-

cause it is obvious that the jury could only rely on the testimony presented at trial in determining the appropriate damage award. Thus, in this case, since the plaintiff only proved the damages which arose from the failure to complete the construction project, the jury could only award damages resulting from M-S Associate's failure to complete the construction project and not solely damages based on their speculative estimation of fair compensation for the defendants' mere failure to secure FmHA financing.

Further, we reject the defendants' contention that the evidence was insufficient to support the plaintiff's theory that M-S Associates' failure to renew the application for singular FmHA financing caused the construction project not to be built. Kenneth Frost, the county supervisor of the Farmer's Home Administration office, testified at trial that he knew of no reason why the plaintiff's original application for FmHA financing could not have been processed to a successful conclusion if the parties had renewed their application and submitted the proper documents after the 16-unit project was abandoned. Further, the FmHA had already given a preliminary concurrence on the original application for singular FmHA financing and the agency had informed the parties that further action was necessary for continued consideration of that application. The defendants failed to offer any testimony establishing either that FmHA financing was unattainable even if the application had been renewed or that the construction project could not have been completed even if the financing had been secured. In contrast, the testimony established clearly that the defendants successfully secured FmHA financing for several other projects during the time period involved in this case and completed construction of those other similar projects.

The defendants also argue that the $2,900 in damages awarded by the trial court for loss of cash flow were not established as a matter of law because the trial court failed to submit a jury question on the issue of William Mazer's authority to bind the corporation to an addendum to the contract guaranteeing this annual "cash flow." In addressing this question of William Mazer's apparent authority to bind the corporation to the addendums, the appellate court held that by failing to object at the trial and on motions after verdict, the defendants had waived any error that resulted from the trial court's failure to give an apparent authority instruction.

A review of the record in this case establishes that although the trial court acknowledged the factual aspects of the issue of apparent authority, it decided not to submit this question to the jury and the defendants failed to enter an objection at the trial. Further, it can be noted that the defendants failed to raise the issue of apparent authority in motions after verdict although it was apparent from the plaintiff's motion after verdict that he claimed that he was entitled to the $2,900, delineated as "cash flow," as a loss guaranteed under the contract.

In light of these facts, we agree with the appellate court that the defendants' failure to object to the trial court's omission of an apparent authority instruction constitutes a waiver of their right to allege error in the jury instructions. Sec. 805.13(3), Stats., expressly provides that failure to object to the proposed instructions at the instruction and verdict conference constitutes a waiver of error in the instructions or verdict. Further, this court has consistently held that generally no error of the trial court is reviewable as a matter of right on appeal without having given the trial court an opportunity to be apprized of and correct the error and order a new trial if necessary based on such error.

"It is clear that no error of the trial court is reviewable as a matter of right on appeal without first moving for a new trial based on such error. *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N.W.2d 380.

"In *Kobelinski v. Milwaukee & Suburban Transport Corp.* (1972), 56 Wis. 2d 504, 517, 518, 202 N.W.2d 415, this court said that the burden was on the moving party to demonstrate that the alleged error was specifically called to the attention of the trial court. This court said:

" 'Motions after verdict must state with particularity the alleged error so as to apprise the trial court of the alleged error and give it an opportunity to correct it, thereby avoiding a costly and time-consuming appeal. . . .

" 'The law is clear that the failure to point out with particularity the grounds for error in a motion after verdict constitutes a waiver of such errors. The trial court need not work on a generalization of error.' " *Calero v. Del Chemical Corp.*, 68 Wis. 2d 487, 497, 228 N.W.2d 737 (1975).

Although we hold that the defendants waived their objections to the trial court's failure to submit an apparent authority instruction, we also point out that the defendants failed to submit any evidence at trial rebutting the plaintiffs' proof establishing that the "cash flow" was among the benefits of the contract within the reasonable contemplation of the parties. Thus, even if William Mazer had lacked apparent authority to bind the corporation, there is no evidence disputing the plaintiff's claim to the stipulated $2,900 "cash flow" as a consequential damage within the reasonable contemplation of the parties.

Because we conclude that the damages sustained by the plaintiff as a result of the defendants' breach of the contract were established and uncontradicted by the evidence presented at trial, we hold that the trial court did not err in ruling as a matter of law that the appropriate damage figure was $50,400.

*Personal Liability*

The defendants also allege that the trial court erred in imposing joint and several liability on the individual defendants. Because the court of appeals held that the defendants had waived their right to raise this issue by failing to move for a new trial based upon this error at the trial court level, they did not reach the merits of this question. We disagree with the appellate court's finding of waiver and address the question of the defendants' personal liability.

A careful review of the record in this case demonstrates that the jury verdict found only that the defendants, M-S Associates and the Guardian Corporation, had breached the construction contract and that there was no jury question of individual liability nor was there sufficient testimony to substantiate the submission of a jury question much less a finding on the issue. Thus, we agree with the defendants there was no reason for them to raise or argue the issue of personal liability prior to the trial court's bold and unsupported conclusion in its memorandum decision on motions after verdict that imposed joint and several liability on the individual defendants. Further, it can be pointed out that while the plaintiff contends that he raised the issue of personal liability in his motions after verdict, close inspection of that motion demonstrates that it merely requests judgment "against the defendants" in accordance with the verdict in such broad language that it does not in any other way specifically indicate that he was requesting that the court impose personal liability on the individual defendants.

As will be demonstrated later in this opinion, the question of whether in a given case the defendants are individually liable presents both a question of law and fact. Thus, in this case, the trial court should not have resolved the issue, much less made a finding of its own,

unless those factual questions could be resolved as a matter of law. Here there was insufficient evidence presented at trial to merit either a jury question on individual liability or a resolution of the issue as a matter of law.

From our review of the proceedings in the trial court, it is clear that the imposition of personal liability in the trial court's memorandum decision was unexpected and unsupported in the record. Further, there was no relevant testimony or ruling on the issue of individual liability prior to the court's memorandum decision upon which the defendants could base a motion after verdict. Under these circumstances, we hold it would be unfair to conclude that the defendants had waived their right to a review of the issue of personal liability and, thus, we do not agree with the appellate court's finding of waiver and we proceed to consider this question.

Our analysis of this issue is hampered, however, because of the failure of the trial court in its memorandum decision on motions after verdict to recite any rationale, testimony, or legal authority to support the imposition of personal liability on the individual defendants. The plaintiff, agreeing with the trial court's decision, argues that the defendants Robert Stauber and Richard Mazer are personally liable because they are licensed architects and the construction contract was one for professional services and, therefore, the breach thereof was a breach of their professional duties. The plaintiff further contends that the fact that the contract was entered into by M-S Associates, a professional service corporation, does not preclude a finding of personal liability for both the Michigan and Wisconsin Statutes provide for the formation of professional service corporations and expressly preserve the personal liability of professionals

practicing in the corporate form.[3] The personal liability of William Mazer, although not an architect, is predicated upon the fact that as an employee he was a principal party to the performance of the alleged professional services assumed under the Herkert project and had responsibility for the Herkert contract.

The Michigan statute on which the plaintiff primarily relies for support of the trial court's imposition of personal liability provides as follows:

"450.226 **Negligence, wrongful acts, misconduct of licensee; liability of licensee or corporation**

"Sec. 6. Nothing contained in this act shall be interpreted to abolish, repeal, modify, restrict or limit the law now in effect in this state applicable to the professional relationship and liabilities between the person furnishing the professional services and the person receiving such professional service and to the standards for professional conduct. Any officer, shareholder, agent or employee of a corporation organized under this act shall remain personally and fully liable and accountable for any negligent or wrongful acts or misconduct committed by him, or by any person under his direct supervision and control, while rendering professional service on behalf of the corporation to the person for whom such professional services were being rendered. The corporation shall be liable up to the full value of its property for any negligent or wrongful acts or misconduct committed by any of its officers, shareholders, agents or employees while they are engaged on behalf of the corporation in the rendering of professional services." M.C.L.A. sec. 450.226.

---

[3] The plaintiff relies in part of the Michigan statutory provisions because defendant Mazer-Stauber Associates, P.C. is a Michigan personal service corporation. Neither party to this lawsuit has addressed the potential question of conflicts of laws as it applies to the issue of the personal liability of the defendants organized as a professional service corporation under the laws of Michigan but practicing in Wisconsin. We need not address this question in resolving the case at bar as our analysis of the issue of personal liability is the same under either the relevant Michigan or Wisconsin statutory provisions.

From this statutory language, it is clear that when dealing with a professional service corporation personal liability will not lie for a breach of contract unless the contract is one for the rendition of *professional services* and the breach constitutes negligent or wrongful acts or misconduct committed during the rendition of those professional services.

The term "professional services" as used in M.C.L.A., sec. 450.226 is defined in M.C.L.A., sec. 450.222(2) in the following manner:

"450.222 **Same; definitions**
"Sec. 2 As used in this act:
"(a) 'Professional service' means any type of personal service to the public which requires as a condition precedent to the rendering of the service the obtaining of a license or other legal authorization. . . ."

Applying this definition to the case at bar, it can be noted that the record is devoid of any evidence establishing that a license or other legal authorization is a condition precedent to one aiding in securing approval of an application for FmHA financing. Further, the common conception of "professional architectural services" is confined to consultation, evaluation and planning of architectural and structural design as well as supervision of the construction project, and not the securing of financing.

Sec. 443.08(4)(a), Wisconsin Stats., like the Michigan statute discussed above, preserves the personal liability of a professional architect's practicing as a personal service corporation as is seen below:

"443.08 **Registration requirement: firms, partnerships and corporations.**
"(4)(a) No firm, partnership or corporation may be relieved of responsibility for the conduct or acts of its agents, employes or officers by reason of its compliance with this chapter, nor may any individual practicing

architecture or professional engineering be relieved of responsibility for architectural or professional engineering services performed by reason of his or her employment relationship with the firm, partnership or corporation." (Formerly sec. 443.01(7) (d) 1, Stats. of 1977.)

The express language of this statute, like the Michigan statute, only preserves personal liability when rendering "architectural or professional engineering services."

The term "practice of architecture" as used in sec. 443.08, Wis. Stats., above is defined as follows:

"443.01 **Definitions.** In this chapter, unless the context provides otherwise:
". . .
"(2) 'Practice of architecture' includes any professional service, such as consultation, investigation, evaluation, planning, architectural and structural design, or responsible supervision of construction, in connection with the construction of any private or public buildings, structures, projects, or the equipment thereof, or addition to or alterations thereof, in which the public welfare or the safeguarding of life, health or property is concerned or involved." (Formerly sec. 443.01(2) (b), Stats. of 1977.)

The language used in sec. 443.01(2), Stats., cannot be interpreted so broadly as to include assistance in securing financing or body politic approval[4] for a construction project within the definition of the "practice of architecture."

---

[4] We have used the term "body politic approval" to describe the kind of political approval for a construction project from a village board, city council, town board or other governmental entity which represents the policy decision of that body politic to favor a certain project. This type of approval must be sought before HUD low income housing can be built in a specific community. This political policy approval is to be distinguished from the governmental approval for a project which relates to conformance with a building code or zoning requirements which are frequently characterized as ministerial acts.

Our review of both sec. 443.08 (4) (b), Wis. Stats., and sec. 450.226, Michigan Compiled Laws, demonstrates that both statutes only preserve personal liability for "professional services" and, thus, in this case, only support the imposition of liability based upon those services which can be defined as "architectural services" rendered by the architects practicing as professional service corporations. Since neither the Michigan nor the Wisconsin definitions of professional services can be interpreted to include assistance in securing financing or body politic approval within the definition thereof, we reach the question of whether the breach of the contract in the case at bar related to "professional services."

This court was faced with a similar question of whether a certain contract was a contract for "professional services" in *Lorenz v. Dreske,* 62 Wis. 2d 273, 214 N.W.2d 753 (1974). In that case, we used the following language to point out that the profession of a person performing a service does not necessarily determine the nature of the service being performed:

"It is true that the nature of a service performed is not necessarily determined by the profession of the person performing the service. Thus, an attorney or a doctor may have a business in addition to his professional practice and any services performed as a businessman would not be rendered 'professional services.' However, simply because certain services may be performed by persons who are not members of a particular profession, this does not mean that when they are performed by a member of a profession they may not be considered professional services." *Id.* at 281.

Applying the reasoning quoted above to the case at bar, we point out that where an architect also involves himself in the business of securing governmental financ-

ing as well as approval of a body politic, a breach of the contract to provide those nonarchitectural services is not a basis for personal liability where the breach does not relate to "professional architectural services" rendered.

While *Lorenz v. Dreske* deals with the meaning of the term "professional services" as used in a statute of limitations, our conclusion that the profession of the person rendering services is not determinative of the nature of the services rendered is equally applicable to the case at bar. The mere fact that a professional, such as a doctor, dentist, lawyer or architect, enters into a contract that involves performing some professional service and some other service not within his professional expertise (financing, etc.) does not necessarily make or change that contract into a contract for "professional services" nor does it automatically transform the breach of the contract into a breach of professional obligations in his field of expertise. In order for the breach of a contract entered into with a professional service corporation to result in personal liability, it must be proved both that the breach relates to "professional services" and that the breach was a negligent or wrongful act committed in the rendition of those professional services. This rule preserves the personal responsibility of a professional for services within his expertise and which the client has every right to expect will be performed in a professional manner.

In *Lorenz v. Dreske, supra,* we noted that the question of whether a contract is one for professional services is a "matter of mixed law and fact." *Id.* at 279. As we made reference to earlier, the trial court, in this case, failed to make any findings or conclusions of law upon which it based its conclusion that the individual defendants were personally liable. In *Afram v. Bafour,* 63

Wis. 2d 702, 218 N.W.2d 288 (1974), we addressed a similar situation in which the trial court did not make any findings to support its conclusion of law and determined that the trial court's decision would be sustained only if supported by the preponderance of the evidence.

"Ordinarily, our question on review is to look to the findings and sustain them unless they are contrary to the great weight and clear preponderance of the evidence. In the instant case, since there are no findings, the trial judge's conclusion is not to be given the special deference which this court ordinarily gives to a finder of the facts. What we review is a conclusion of law. Accordingly, that conclusion will be sustained only if it is supported by the preponderance of the evidence, *i.e.,* we are obliged to put ourselves in the shoes of the fact finder and test the plaintiff's assertion of jurisdiction. This court, however, is one of appellate jurisdiction only, and we will resolve factual matters only when they are undisputed or susceptible to proof by judicial notice." *Id.* at 708.

Applying this standard to the case at bar, we review the evidence to determine whether the conclusion that the contract was one for professional services is sustained by a preponderance of the evidence.

We begin our analysis by pointing out that the contract entered into between the plaintiff and M-S Associates is titled an "Owner-Builder Agreement." This title implies that the services contracted for extend beyond those one would expect in an architect-client relationship. A careful review of the document reveals that architectural services are viewed as making up only a portion of the services provided under the contract and that M-S Associates assumed numerous contractual obligations over and above the obligations an architect normally owes a client. The obligations of this contract include not only assisting Herkert to secure financing

and approval of the body politic, but also the guarantee of an annual cash flow from the construction project.

The record is devoid of any evidence establishing that it is the responsibility or normal practice of professional architects to assist a client in securing financing or approval of a body politic for a construction project. Justin Sweet, a well-recognized legal authority in the area of architectural and engineering law, however, states that such services are "not part of the professional education and training of a design professional and should not be considered part of basic design service."[5] There is no evidence in the record establishing in any way that the service of securing governmental financing is within the expertise of an architect, or that such service is or should be performed by a professional architect as part of his performance of "professional services."

The record is also devoid of evidence establishing the responsibility or standard of care owed by a professional who attempts to perform services beyond his professional expertise, knowledge and training such as rendering assistance in applying for governmental financing. Concerning this question, we note that there is considerable authority requiring expert testimony to demonstrate malpractice on the part of any professional, including architects, except where the breach of professional duties can be readily determined by a juror. *See:* Anno. *Expert Testimony—Architects Malpractice,* 3 A.L.R. (4th ed.) 1023. No such testimony was presented in the case at bar.

The plaintiff places considerable reliance upon the fact that the contract recites that it is to be undertaken in "accordance with the highest professional standards." A careful reading of this phrase in the contract demon-

---

[5] *Legal Aspects of Architecture, Engineering and the Construction Process,* Justin Sweet (2d ed. 1977).

strates that this representation is limited to the "architectural and engineering construction services" to be rendered under the contract and these services are independent of the obligation to assist in securing FmHA financing.

In light of the fact that plaintiff failed to prove that the services of assisting in securing financing and body politic approval are part of the accepted architect-client relationship or within the legal definitions of professional architectural expertise and the fact that the record is devoid of any evidence establishing that the general practice among architects is to assist a party to secure financing, we hold that the plaintiff has not proved by a preponderance of the evidence that the breach of the contract related to "professional services." Thus, we hold that the trial court erred in imposing personal liability upon the individual defendants for contractual obligations beyond their field of expertise as professional architects.

Our determination that the breach did not relate to "professional services" relieves William Mazer of any liability arising from his status as an employee of a professional service corporation. It is unclear whether the plaintiff is also arguing that the personal liability of defendant, William Mazer, is independently based upon his alleged representations assuming personal responsibility for the contract. Based upon our review of the record in this case, however, we conclude that there is insufficient evidence to establish such personal liability on the part of William Mazer.

Finally, we note that there is no evidence in the record establishing the responsibility for the breach of the contract as to any one or more of the three individual defendants. The plaintiff in his brief appears to assume that as a matter of law the breach of a contract

entered into by a professional service corporation results in personal liability on the part of each and every member of the professional corporation regardless of his role in the contractual dealings or responsibility for the breach. We do not agree that personal liability can be assumed from the breach of a professional service contract as a matter of law, and, since we hold that the plaintiff failed to establish that the contractural obligation involved in the case at bar is one for "professional services," we need not resolve this question.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part and the judgment of the circuit court is modified accordingly.

ABRAHAMSON, J., concurs. No opinion filed.