**RIVERFRONT LOFTS CONDO-MINIUM OWNERS ASSO-CIATION, Plaintiff,**

v.

**MILWAUKEE/RIVERFRONT PROPERTIES LIMITED PARTNERSHIP, Defendant.**

No. 01–C–0576.

United States District Court, E.D. Wisconsin.

Dec. 10, 2002.

Morton M. Grodsky, Mequon, WI, for Plaintiff.

Stephen L. Fox, Brookfield, WI, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

In this diversity case, an association of condominium owners sued the condominium developer for damages resulting from alleged defects in the construction of the building. The alleged defects included: (1) a facade which was separating from the building; (2) inadequate soundproofing; (3) insufficient access to air conditioners; (4) unfinished work in the common area stairwells and hallways; (5) defectively in-

stalled balconies; and (6) construction debris left on site. Plaintiff brought tort claims, claims for breach of contract, and claims under Wis. Stat. § 706.10(7) for breach of the implied covenant of workmanlike performance and reasonable adequacy for purpose.

Before trial, I dismissed plaintiff's tort claims as barred by the economic loss doctrine. The case was then tried to the court. After the trial, I rendered an oral decision and, pursuant to Fed.R.Civ.P. 52(a), stated findings of fact and conclusions of law. I indicated that the court had subject matter jurisdiction based on diversity of citizenship. Plaintiff is a citizen of Wisconsin. Defendant is an Illinois limited partnership, none of the partners of which are residents of Wisconsin. I also determined that the association of condominium unit owners had standing to bring the action, and that Wisconsin substantive law governed plaintiff's claims. I rejected plaintiff's breach of contract claims except for the claim relating to unfinished work in the stairwells and hallways for which I found defendant liable. However, I left open the question of damages. I rejected plaintiff's breach of implied warranty claim concerning the balconies but reserved decision on its other breach of implied warranty claims in order to do additional research.

I now address plaintiff's breach of implied warranty claims relating to defects in the facade, inadequate soundproofing, insufficient access to air conditioners, and construction debris left on site. I also address the issue of damages concerning defendant's failure to complete work in the stairwells and hallways. In the course of addressing these issues, I state additional findings of fact and conclusions of law.

## I. FACTS

In 1991, defendant Milwaukee Riverfront Properties, L.P. ("MRP"), an Illinois limited partnership, purchased an approximately 100–year–old ten-story historic building bordering the Milwaukee River in downtown Milwaukee. Previously, the building contained commercial and unfinished warehouse space. Acting through its principal, David Zazove, MRP converted the building into luxury condominium units. Among other things, MRP subdivided areas, installed walls, new plumbing, heating and cooling systems, and hardwood floors and repaired some deterioration in the exterior facade. The resulting units have an open, loft style with hardwood floors, high ceilings and exposed duct-work and piping. Starting in January 1998, MRP began selling the units but retained ownership of portions of the common areas until January 2000, when it ceded control to plaintiff, Riverfront Lofts Condominium Owners' Association (the "Association" or "plaintiff"). I now turn to the relevant facts relating to each of the construction defects alleged by plaintiff.

### A. The Facade

The Riverfront Lofts building has a brick and terra cotta facade. In December 1997, approximately one month before the sale of the first condominium unit closed, MRP hired Graef, Anhalt, Schloemer and Associates, a Milwaukee engineering firm, to complete a condition survey of the building (the "Building Condition Survey" or "Survey"). Bob Grothman, the author of the Building Condition Survey, testified that he inspected the facade by standing outside at street level and attempting to look at all four faces of the building using binoculars. However, he stated that he could not see the south and east faces, and could see very little of the north face.

Grothman testified that in the areas that he could see, the facade showed some deterioration and needed tuck-pointing, but

was not "tremendously bad." Based on his observations and on the fact that he could not see most of the facade clearly, he recommended that MRP conduct a more detailed inspection. (*See also* Building Condition Survey, Trial Ex. 2 at 3–5 ("While the problem areas noted did not appear to be significant, a detailed inspection of the facade should be performed. This will insure that the minor deteriorated areas noted are not indicative of a more widespread or underlying problem that could have been missed from far away.").) Grothman also recommended that MRP repair spalls—areas where the concrete was chipping and falling off—on the elevator machinery room walls and on the exterior faces of the building, tuck-point brick joints, and treat the exterior brick with a penetrating sealer. He stated that deterioration would continue if not repaired. He testified that he had also observed that some pieces of brick had fallen from the building.

Zazove reviewed the Building Condition Survey and had the brick joints tuck-pointed and the spalls on the elevator machinery room walls repaired. However, he did not order a more detailed inspection of the facade or apply a penetrating sealer as the Building Condition Survey recommended.

Zazove testified that in 1998, MRP performed some ornamental work on the facade, which involved replacing some masonry at the base of the building and placing placards on the front face. Condominium unit owner, Fredrick Dichter, disputed this testimony but acknowledged that he did not move into the building until November 1998. I credit Zazove's testimony that MRP did ornamental facade work in 1998.

By 2000, the terra cotta and brick in the facade were spalling significantly. On August 18, 2000, at the request of the Association, Dan Cohen, an engineer, inspected the facade. He testified that he saw "large scale degeneration" and concluded that the building had not been properly maintained. He reported to the Association that:

Major repairs to the masonry and terra cotta are required. They are extensive and expensive. The present state of the exterior shell is one of disintegration and hazardous to pedestrians below. . . .

The west and south terra cotta facing tiles are cracked, spalled and missing around the sills and window headers. Prior replacements used face brick.

The brick masonry parapet wall at the northeast is cracked and separated from the building wall with a large vertical crack.

The brick masonry back up for the terra cotta facing at the southwest corner of the building is vertically separated from the upper story.

Water penetration into the north concrete structural frame has caused the reinforcing steel to rust and spall the concrete cover over the steel.

All of the openings cut through the south wall for windows and vents are not sealed against the weather. Brickwork is incomplete.

(Trial Ex. 21 at 2.) He stated that repair of all four faces was necessary to maintain the structural integrity of the building and recommended that the Association solicit proposals from contractors.

Cohen also notified the City of Milwaukee, and the City inspected the property. The building inspector concluded that the deterioration of the terra cotta on the west facade was so extensive that it violated a City ordinance. Thus, on September 22, 2000, the City issued a notice of violation and ordered the Association to "[r]epair or replace all defective or deteriorating terra cotta" within thirty days. (Trial Ex. 3.) The City also ordered the installation of a canopy over the sidewalk adjacent to the

west face to protect pedestrians from falling terra cotta.

Cohen testified that, in his opinion, the deterioration was present in December 1997; although, he acknowledged having been less certain in his deposition. MRP called William Dossett, a contractor, as a witness, and Dossett testified that he reviewed photographs of the facade (only some of which were taken before the Association had the facade repaired) and that, based on the photographs, he believed that in 2000 the building was in good shape for its age and not hazardous.

I find that the facade had deteriorated substantially by January 2000 when the Association took over the building. Cohen is an engineer with forty years of experience in the building industry. Thus, his opinion that substantial deterioration was present since late 1997 is entitled to significant weight.

Grothman's testimony did not contradict Cohen's. Grothman testified that in December 1997, he could only see the west face of the building clearly. Further, he recommended a more thorough inspection to "insure that the minor deteriorated areas noted [were] not indicative of a more widespread or underlying problem that could have been missed from far away." (Trial Ex. 2 at 3–3.)

To the extent that Dossett disagreed with Cohen, I give Cohen's testimony greater weight. Unlike Cohen, Dossett did not see the facade before it was repaired. In addition, Dossett's testimony that the facade was in good condition and not hazardous was not only inconsistent with Cohen's opinion but also with that of a City building inspector.

After the City ordered plaintiff to repair the facade, plaintiff asked MRP to do the work, but MRP declined. Plaintiff then solicited bids for the work from two masonry contractors and hired the low bidder, Holton Bros., which repaired the facade for $154,157. Thomas Holton, vice president of Holton Bros., testified that approximately ten percent of the terra cotta on all four faces was close to falling off, that substantial masonry work was needed to maintain the structural integrity of the building, and that his company's work was necessary to accomplish this purpose.

While agreeing that Holton Bros.'s charges were reasonable for the work that it did, MRP disputes that the work was necessary. It points to the testimony of Dossett, who stated that Holton Bros. could have patched some of the failing masonry rather than replacing it altogether.

I find that Holton Bros.'s work was necessary to maintain the building's structural integrity and that its charges were reasonable. Both Cohen and Holton testified to this effect. Even Zazove agreed that some of the work was necessary. The only witness who testified that Holton Bros. did more than was necessary was Dossett, who did not actually see the facade before it was repaired.

To pay for the $154,157 for the repair of the facade, the Association specially assessed unit owners. MRP owned two units and paid $2,200. The Association thus seeks $151,957 in damages.

## B. Soundproofing

The Association also alleges that MRP failed to adequately soundproof the units on the sixth through tenth floors. Condominium owner Claude Krawczyk testified that residents can hear footsteps in the hallways outside their units and in the units above theirs, and footsteps and running water in units on the same floor. He stated that to muffle the impact noise from the hallways the Association placed carpet runners in the hallways.

John R. Yerges, a sound engineer, tested the impact noise that traveled horizontally (between units and between a unit and the hallway on the same floor) and vertically (between units on different floors). Using a machine that taps at a designated frequency, Yerges recorded the field impact isolation class ("FIIC") rating of the sound. He stated that for residential condominiums an FIIC rating of fifty-five is the accepted level for sound transmission between units, fifty is the accepted level for sound transmission between a common area and a unit, and that lower ratings are considered unacceptable.

Tapping in the sixth floor hallway resulted in an FIIC rating of forty-two in the adjacent sixth floor unit, and tapping in the ninth floor hallway resulted in an FIIC rating of thirty-nine in an adjacent ninth floor unit. The results between units on the same floor were similar. Yerges opined that these unacceptable FIIC ratings resulted from a failure to construct the hardwood floors and walls so as to provide an adequate sound barrier. Specifically, he stated that the demising walls [1] rest directly on top of the hardwood floors but should have been built to rest on structural subfloors with the hardwood abutting them.

Tapping in a unit on the seventh floor resulted in an FIIC rating of fifty-seven in the sixth floor unit below, an acceptable rating; however, tapping in a unit on the ninth floor resulted in an FIIC rating of forty-three in the eighth floor unit below. Yerges opined that the low rating on the eighth floor resulted from the construction of the floors themselves. They were built using a "sleeper" system, which involves boards known as sleepers resting on the concrete structural floor, and hardwood floorboards resting on top of the sleepers. He stated that the sleeper system creates space between the hardwood floorboards and the structural floor and allows for the easy transmission of impact noise unless a sound dampening pad is installed.

Dossett testified that he also tested horizontal impact noise between the units. He stated that he stood inside a unit on one of the top floors while someone walked down the hallway. He reported that while he could hear the footsteps of a person wearing street shoes, he could not hear someone wearing rubber soled shoes and could not hear footsteps at all when the person walked on the carpet runner that the Association had placed on the hallway floor.

He also testified that he had reviewed the plans and specifications for floors five through ten, and that they called for sound insulation in the walls between units and for rubber rings around copper water pipes, both of which he observed in a unit that was being remodeled. The plans also provided for the demising walls to be placed on top of the hardwood floors. He testified that, based on his experience, this was the customary and proper way to construct the walls. He stated that because the hardwood floors existed on floors five through seven before the remodeling, the alternative of removing parts of the floors so as to rest the demising walls on the structural floors would have been very costly, ruined the existing hardwood floors and not substantially diminished impact noise. He stated that he had never seen that type of construction in a rehabilitated building with existing hardwood floors. Dossett testified that, on floors eight through ten, where there were no existing hardwood floors, MRP could have constructed the floors and walls differently or installed a sound-dampening pad without destroying the floors. However, he said that such construction would have been inconsistent with the construction in the rest of the building.

1. Demising walls are the walls the divide one unit from another unit or from a hallway.

Dossett also testified that constructing floors by means of a sleeper system is the usual and best way to build a hardwood floor, because it results in a softer floor than if the floorboards rested directly on the subfloor. Dossett admitted that a sleeper system causes sound to be transmitted but stated that the difference in impact noise between floors constructed with and without sleepers is minimal.

Finally, Dossett stated that the characteristics that define loft-style apartments are open space, hard surfaces and little soundproofing, and that these characteristics make sound transmission inevitable.

The Association seeks $297,041 to remove the floors, install sound dampening material, reinstall the floors and install sound barriers in the walls.

## C. Access to Air Conditioners

Plaintiff also alleges that MRP improperly installed certain air conditioners by making them inaccessible for service and repair. Frank Karoly, president of Iron Fireman, a heating and cooling contractor, testified that the air conditioners in the hallways on the second and fourth floors were installed approximately three to four inches apart. Thus, one unit could not be repaired or serviced without removing the other. He stated that the cost of relocating the units to make them accessible for routine service and maintenance was $12,100. He also testified that MRP installed air conditioners in sixteen condominium units on the fifth through tenth floors by placing them above either drywall or push-up tile ceilings that contained no access panels. He stated that it was possible to perform routine maintenance on such units, but that there was not enough access to replace equipment or do major repair work. The parties stipulated that the cost of creating such access would be $7,760.

## D. Construction Debris

Plaintiff also alleges that MRP failed to clean up on-site construction dust and debris. In 2001, the Association hired Jay Patten Enterprises to clean up construction dust, paint and plaster, wash the stairway hand railings, steps, doors and windows, polish and wax the stairways and clean the fire insulating product from the trash room, doors, walls and garage floor. The total cost for these services was $7,900.

## E. Completing Work in the Stairwells and Hallways

I previously determined that MRP breached its agreement with condominium owner Krawczyk (the "Krawczyk closing agreement"), which Krawczyk subsequently assigned to the Association, to perform the following work:

F. Complete renovation of the south corridors on the 5th, 6th and 7th floors, including fire escape doorways and doors, replacement of missing or damaged flooring and repair of ceilings, beams and walls (to the same standard as completed on floors 2, 3 and 4)....

G. Complete main and east stairwells, including floors, trim and walls and including removal of the abandoned telephone main box located near the Riverwalk entrance and all dead wiring going up the stairwell from the box. Clean slate stairs....

H. Complete all corridors, including painting the 6th floor ceiling and completing all wood trim....

(Trial Ex. 4 ¶ 6.)

The Krawczyk agreement places a dollar figure after each of the above items, $3,000, $3,000 and $2,000 respectively. (*Id.*) However, the agreement also states that if the items cost more, then MRP must pay the higher amount. (*Id.* ¶ 8.) Krawczyk testified that he and MRP's at-

torney drafted the agreement, but that MRP's attorney insisted on placing dollar figures next to the items. According to Krawczyk, the amounts were very rough estimates and were not intended to bind the parties.[2]

The Association also obtained a bid from House Doctor, a building maintenance contractor, to perform cleaning and repair work. The bid itself is not in evidence. The parties stipulated that the amount of the bid was between $58,000 and $60,000; however, the record contains no evidence of precisely what work the bid included.

Dossett testified that he recalled that in his deposition he had estimated that the cost of repainting walls in the stairwells and refinishing the wood floors at the landings would be around $40,000.

## II. CLAIMS FOR BREACH OF IMPLIED COVENANT

The Association argues that MRP breached the covenant of workmanlike performance and reasonable adequacy for purpose implied by Wis Stat. § 706.10(7). Section 706.10(7) states:

In the absence of an express or necessarily implied provision to the contrary, a conveyance evidencing a transaction under which the grantor undertakes to improve the premises so as to equip them for grantor's specified use and occupancy, or to procure such improvement under the grantor's direction or control, shall imply a covenant that such improvement shall be performed in a workmanlike manner, and shall be reasonably adequate to equip the premises for such use and occupancy.

The statute provides that a covenant will be implied into certain conveyances. *Brooks v. Hayes*, 133 Wis.2d 228, 235 n. 3, 395 N.W.2d 167 (1986) ("The legislature has apparently ... expressed the policy that a construction contract includes an implied agreement to perform the contract in a workmanlike manner.").

Wisconsin is not unique in recognizing an implied warranty of workmanlike performance and/or fitness for purpose in new home sales. Forty-two states do likewise.[3]

2. Krawcyk's testimony is properly considered notwithstanding the parol evidence rule because the contract is ambiguous with regard to the damages for the described items. *See Energy Complexes, Inc. v. Eau Claire County*, 152 Wis.2d 453, 468, 449 N.W.2d 35 (1989).

3. La.Rev.Stat. Ann. § 3141050; Minn.Stat. § 327A.02(1); Va.Code. Ann. § 55–701; *Sims v. Lewis*, 374 So.2d 298 (Ala.1979); *Columbia Western Corp. v. Vela*, 122 Ariz. 28, 592 P.2d 1294 (Ariz.App.1979); *Wawak v. Stewart*, 247 Ark. 1093, 449 S.W.2d 922 (1970); *Pollard v. Saxe & Yolles Dev. Co.*, 12 Cal.3d 374, 115 Cal.Rptr. 648, 525 P.2d 88 (1974); *Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399 (1964); *Vernali v. Centrella*, 28 Conn.Supp. 476, 266 A.2d 200 (1970); *Koval v. Peoples*, 431 A.2d 1284 (Del.Super.Ct.1981); *Gable v. Silver*, 258 So.2d 11 (Fla.Dist.Ct.App.1972), opinion adopted by 264 So.2d 418 (Fla.1972); *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966); *Petersen v. Hubschman Constr. Co.*, 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d

1154 (1979); *Barnes v. Mac Brown & Co.*, 264 Ind. 227, 342 N.E.2d 619 (1976); *Kirk v. Ridgway*, 373 N.W.2d 491 (Iowa 1985); *McFeeters v. Renollet*, 210 Kan. 158, 500 P.2d 47 (1972); *Crawley v. Terhune*, 437 S.W.2d 743 (Ky.1969); *Albrecht v. Clifford*, 436 Mass. 706, 767 N.E.2d 42 (2002); *Banville v. Huckins*, 407 A.2d 294 (Me.1979); *Loch Hill Constr. Co. v. Fricke*, 284 Md. 708, 399 A.2d 883 (1979); *Weeks v. Slavik Bldrs., Inc.*, 24 Mich.App. 621, 180 N.W.2d 503, aff'd, 384 Mich. 257, 181 N.W.2d 271 (1970); *Brown v. Elton Chalk, Inc.*, 358 So.2d 721 (Miss.1978); *Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795 (Mo.1972); *Chandler v. Madsen*, 197 Mont. 234, 642 P.2d 1028 (1982); *Norton v. Burleaud*, 115 N.H. 435, 342 A.2d 629 (1975); *Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314 (1965); *De Roche v. Dame*, 75 A.D.2d 384, 430 N.Y.S.2d 390 (N.Y.App.Div. 1980), appeal dismissed by 51 N.Y.2d 821, 433 N.Y.S.2d 427, 413 N.E.2d 366 (N.Y.1980); *Griffin v. Wheeler–Leonard & Co.*, 290 N.C. 185, 225 S.E.2d 557 (1976); *Velotta v. Leo*

However, few reported Wisconsin cases discuss the implied covenant. Other than *Brooks* only three appellate decisions do so, all unpublished. In *Bero v. White House Homes, Inc.*, No. 78–618, 1979 WL 30471, **2–3, 1979 Wisc.App. LEXIS 3267, at *4–6 (May 31, 1979), the court of appeals concluded that Wis. Stat. § 706.10(7) implied a warranty in a contract for the construction and sale of a home and that, based on the warranty, the buyer could recover for latent defects. In *Maltbey v. Nu Way Bldrs., Inc.*, No. 84–921, 1985 WL 188050, *1, 1985 Wisc.App. LEXIS 3225, at *1 (Mar. 26, 1985), the court of appeals rejected the plaintiff's claim to an implied warranty of habitability in new home sales by a builder-vendor. The court cited § 706.10(7), but determined without explanation that it did not apply. *Id.*, 1985 WL 188050, *1, 1985 Wisc.App. LEXIS 3225, *3. More recently, in *Shisler v. Frank*, No. 97–2310, 1998 WL 255206, **5–6, 1998 Wisc.App. LEXIS 1546, at *13–14 (Ct.App. May 21, 1998), the court of appeals held "that there is an implied warranty of fitness for the intended use in the contract for sale of a home or condominium from the builder-vendor to the builder-vendee." The court based its ruling on related state supreme court decisions and cases from other jurisdictions, but did not cite § 706.10(7). *Id.*, 1998 WL 255206, **2–5, 1998 Wisc.App. LEXIS 1546, **6–11.

I now turn to plaintiff's breach of implied covenant claims and will decide them as I believe the state supreme court would, if required to do so. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 636–37 (7th Cir.2002).

## A. Reason for Implied Covenant

Traditionally, sales of real estate including new homes were governed by the rule of caveat emptor. However, modern courts have rejected the rule. Richard A. Lord, *Williston on Contracts* § 50:30 (4th ed.2000) (stating that the modern trend rejects the rule of caveat emptor in new home sales); *see Ollerman v. O'Rourke Co.*, 94 Wis.2d 17, 38, 288 N.W.2d 95 (1980) ("This court has moved away from the rule of *caveat emptor* in real estate transactions, as have courts in other states."); *Shisler*, 1998 WL 255206, *3, 1998 Wisc. App. LEXIS 1546, at *8 (discussing the Wisconsin Supreme Court's gradual rejection of the rule).

Recognizing the changed context of most real estate transactions, courts and legislatures have replaced the rule with implied warranties. As the Illinois Supreme Court explained,

> Many new houses are, in a sense, now mass produced.... The nature of the construction methods is such that a

---

*Petronzio Landscaping, Inc.*, 69 Ohio St.2d 376, 433 N.E.2d 147, 150–51 (Ohio 1982); *Jeanguneat v. Jackie Hames Constr. Co.*, 576 P.2d 761 (Okla.1978); *Yepsen v. Burgess*, 269 Or. 635, 525 P.2d 1019 (1974); *Elderkin v. Gaster*, 447 Pa. 118, 288 A.2d 771 (1972); *Sousa v. Albino*, 120 R.I. 461, 388 A.2d 804 (1978); *Rutledge v. Dodenhoff*, 254 S.C. 407, 175 S.E.2d 792 (1970); *Brown v. Fowler*, 279 N.W.2d 907 (S.D.1979); *Dixon v. Mountain City Constr. Co.*, 632 S.W.2d 538 (Tenn. 1982); *Humber v. Morton*, 426 S.W.2d 554 (Tex.1968); *Rothberg v. Olenik*, 128 Vt. 295, 262 A.2d 461 (1970); *House v. Thornton*, 76 Wash.2d 428, 457 P.2d 199 (1969); *Gamble v. Main*, 171 W.Va. 469, 300 S.E.2d 110, 113

(1983); *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733 (Wyo.1979).

Two other states have approved of the doctrine in dicta. *Ass'n of Apt. Owners of Park Towers v. Child*, 1 Haw.App. 130, 615 P.2d 756 (1980); *SME Indus., Inc. v. Thompson, Ventulett, Stainback and Assocs., Inc.*, 28 P.3d 669, 678 n. 7 (Utah 2001).

For a brief discussion of the history and development of the doctrine, see Jeff Sovern, *Toward a Theory of Warranties in Sales of New Homes: Housing the Implied Warranty Advocates, Law and Economics Mavens, and Consumer Psychologists Under One Roof*, 1993 Wis. L.Rev. 13, 19–23.

vendee has little or no opportunity to inspect. The vendee is making a major investment, in many instances the largest single investment of his life. He is usually not knowledgeable in construction practices and, to a substantial degree, must rely upon the integrity and the skill of the builder-vendor, who is in the business of building and selling houses. The vendee has a right to expect to receive that for which he has bargained and that which the builder-vendor has agreed to construct and convey to him, that is, a house that is reasonably fit for use as a residence.

*Petersen v. Hubschman Constr. Co., Inc.,* 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d 1154, 1157 (1979); *accord Shisler,* 1998 WL 255206, \*\*4–5, Wisc.App. LEXIS 1546, at \* 12–13 (quoting same passage with approval).

Thus, implied warranties in new home sales were created because (1) the builder-vendor is generally in a better position than the buyer to know if serious defects are present; (2) the buyer relies on the builder-vendor's expertise and reasonably expects that the builder-vendor will complete the structure in a workmanlike manner; and (3) the buyer reasonably expects to obtain an adequate structure and thus, any defects undermining a structure's adequacy undermine the essence of the parties' bargain. *Id.; accord Albrecht,* 767 N.E.2d at 46; *Degnan v. Executive Homes, Inc.,* 215 Mont. 162, 696 P.2d 431, 433 (1985); *Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.,* 115 Wash.2d 506, 799 P.2d 250, 259 (1990).

## B. Whether Statutory Preconditions for Implying Covenant Are Met

█ To determine whether the Association may avail itself of the implied covenant, I begin with the language of the statute. Under the statute, a covenant is implied when there is: (1) a conveyance from the grantor to the grantee, (2) "evidencing a transaction under which the grantor undertakes to improve the premises" or "to procure such improvement under grantor's direction", (3) for the grantee's "specified use and occupancy." Wis Stat. § 706.10(7).

Plaintiff has established these elements. First, in sales occurring between January 1998 and September 2000, MRP conveyed to unit owners residential units and, in January 2000, transferred control over the common areas to the Association. Thus, there was a conveyance.

Second, the Association has proven that MRP "agree[d] to improve the premises." An "improvement" is "[a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes." *Black's Law Dictionary* 757 (6th ed.1990). The substantial renovations performed by MRP to the Riverfront Lofts building transformed commercial and warehouse space into luxury residential lofts. MRP fixed exterior masonry, subdivided areas, added walls, floors, heating and cooling systems and plumbing. Thus, MRP improved the property.[4]

█ MRP argues that "improvement" under the statute is limited to those specif-

---

4. Courts in other jurisdictions have also found that implied warranties apply to the substantial renovation of existing structures and not simply new construction. *E.g., Towers Tenant Ass'n, Inc. v. Towers Ltd. P'ship,* 563 F.Supp. 566, 575 (D.D.C.1983); *Council of Unit Own-*ers of Breakwater House Condo. v. Simpler, 603 A.2d 792, 795 (Del.1992); *VonHoldt v. Barba & Barba Constr., Inc.,* 175 Ill.2d 426, 222 Ill.Dec. 302, 677 N.E.2d 836, 839 (1997); *Licciardi v. Pascarella,* 194 N.J.Super. 381, 476 A.2d 1273, 1274 (1983).

ic elements of the building that it actually worked on, that it did not work on the facade and, therefore, the implied covenant does not apply to the facade. However, MRP's undertaking with respect to the building was very broad and consisted of literally transforming the entire property so that it could be used for residences. Further, MRP did perform some work on the facade. Where the scope of a builder's improvement of property is as extensive as it was here, it would be unreasonable to interpret the statute as implying a covenant only with respect to those parts of the building on which the builder performed work. To read the implied warranty so narrowly would undermine the purpose of the statute, which is to encourage the construction of reasonably adequate structures. A builder renovating an existing structure could avoid liability by simply failing to correct existing defects even if the result was an inadequate structure.

Finally, the Association has shown that MRP improved the premises for its members' "specified use and occupancy." *See* Wis. Stat. § 706.10(7). The purpose of the improvements was to permit the building to be used for residences. Such anticipated use is sufficiently specified to trigger the implied covenant.

This conclusion is buttressed by Wisconsin cases allowing purchasers of property intended to be used as a residence to recover from builder-vendors for negligent construction. *See Oremus v. Wynhoff,* 20 Wis.2d 635, 123 N.W.2d 441 (1963); *Fisher v. Simon,* 15 Wis.2d 207, 112 N.W.2d 705 (1961). In *Fisher,* the plaintiffs sued for construction defects in a new house that they had purchased as a residence. Similarly, in *Oremus,* the plaintiffs sued for construction defects in an apartment building.

### C. Whether Defendant Breached Covenant

#### 1. Scope of Covenant and Criteria for Determining Breach

Because plaintiff has shown that MRP's conveyances of condominiums to unit owners are within § 706.10(7), the statute implies a covenant that "improvement[s] ... be performed in a workmanlike manner and ... be reasonably adequate to equip the premises for [the grantee's] use and occupancy." Thus, the covenant includes two warranties, a warranty of workmanlike performance and a warranty that the building will be reasonably adequate for use and occupancy.

Like the Wisconsin statute, courts in other jurisdictions and commentators distinguish between implied warranties covering the manner of performance and those relating to the adequacy of the resulting product. *E.g., Bednarski v. Hideout Homes & Realty, Inc.,* 711 F.Supp. 823, 827 (M.D.Pa.1989); *Council of Unit Owners of Breakwater House Condo.,* 603 A.2d at 795; *Schmeck v. Sea Oats Condo. Ass'n Inc.,* 441 So.2d 1092, 1097 (Fla.App.1983); *Wimmer v. Down E. Props., Inc.,* 406 A.2d 88, 93 (Me.1979); *Albrecht,* 767 N.E.2d at 46 n. 7; *George B. Gilmore Co. v. Garrett,* 582 So.2d 387, 391 (Miss.1991); *Chandler v. Madsen,* 197 Mont. 234, 642 P.2d 1028, 1031–32 (1982); *Aronsohn v. Mandara,* 98 N.J. 92, 484 A.2d 675, 682–83 (1984); *Kennedy v. Columbia Lumber & Mfg. Co., Inc.,* 299 S.C. 335, 384 S.E.2d 730, 736 (1989); *Meadowbrook Condo. Ass'n v. S. Burlington Realty Corp.,* 152 Vt. 16, 565 A.2d 238, 240–41 (1989); Timothy Davis, *The Illusive Warranty of Workmanlike Performance: Constructing a Conceptual Framework,* 72 Neb. L.Rev. 981, 1017–20 (1992).[5] I will discuss each type of implied

---

5. The Texas Supreme Court recently described the relationship between the two types of warranties:

warranty to determine the standard that a builder-vendor must meet to satisfy it.

### a. Workmanlike Performance

■ "Workmanlike" means "worthy of a good workman," "well performed" or "skillful." *Webster's Third New International Dictionary* 2635 (3d ed.1986). If faced with the question, I believe that the Wisconsin Supreme Court would conclude that the standard for determining whether a builder-vender's performance is "workmanlike" is the same as the standard of care for common law negligence. *See* Hal G. Block, *As the Walls Came Tumbling Down: Architects' Expanded Liability Under Design–Build/Construction Contracting*, 17 J. Marshall L.Rev. 1, 18 n. 86 (1984) (stating that warranty of workmanlike performance is a warranty not to act negligently); Michael M. Greenfield, *Consumer Protection in Service Transactions—Implied Warranties and Strict Liability in Tort*, 1974 Utah L.Rev. 661, 666 (stating that implied warranty of workmanlike performance requires non-negligent performance).

Borrowing from tort law is consistent with the Wisconsin Supreme Court's view that poor workmanship under a contract gives rise to claims for both breach of contract and negligence.[6] *See Oremus*, 20 Wis.2d at 643, 123 N.W.2d 441; *Fisher*, 15 Wis.2d at 211, 112 N.W.2d 705. The standard of non-negligence requires a builder to perform construction or remodeling work "with the same degree of care and skill and … provide such suitable materials as are used and provided by contractors of reasonable prudence, skill, and judgment in similar construction." Wis. Jury Instructions—Civil 1022.4 (1992). The standard is the same whether a plaintiff labels the claim as one in tort or contract. For example, in *Fisher*, which involved a tort claim, the court stated that "accompanying every contract is a common law duty to perform it with care and skill, and a failure to do so is a tort as well as a breach of contract." 15 Wis.2d at 211, 112 N.W.2d 705. Thus, the court's conclusion that a builder/vendor has a duty "to use ordinary care in the construction of the [house] or the same degree of care used by similar building contractors in this vicinity in constructing houses," *id.* (internal quotation marks and citation omitted), applies equally whether the claim sounds in tort or contract.

Likewise, in *Brooks*, a contract case, the supreme court held that "although the construction contract [at issue] was silent with

These two implied warranties parallel one another, and they may overlap. For example, a builder's inferior workmanship could compromise the structure and cause the home to be unsafe [thereby breaching the implied warranty habitability]. But a builder's failure to perform good workmanship is actionable even when the outcome does not impair habitability. Similarly, a home could be well constructed and yet unfit for human habitation if, for example, a builder constructed a home with good workmanship but on a toxic waste site. *Centex Homes v. Buecher*, No. 00–0479, 2001 WL 1946128, at *6 (Tex. Aug.29, 2002) (internal citation omitted).

**6.** Recent Wisconsin Supreme Court decisions adopting and applying the economic loss doc-

trine call into doubt whether the court would today hold that a party has a negligence claim under such circumstances. *See, e.g., Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis.2d 235, 593 N.W.2d 445 (1999); *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225 Wis.2d 305, 592 N.W.2d 201 (1999); *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 573 N.W.2d 842 (1998); *see also Mose v. Tedco Equities*, 228 Wis.2d 848, 858–59, 598 N.W.2d 594 (Ct.App.1999) (extending the doctrine to real estate transactions). Indeed, I previously dismissed the Association's tort claims as barred by the economic loss doctrine. However, the decisions have no bearing on the standard of care that a builder-vendor must meet in order to satisfy implied contractual warranties.

regard to the level of performance or standard of care required of [the developer], the contract implicitly impose[d] on [the developer] the duty to perform with due care." 133 Wis.2d at 234, 395 N.W.2d 167. The court explained that " 'accompanying every contract is a common-law duty to perform with care, skill, reasonable expediency and faithfulness the thing they agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract.' " *Id.* at 235, 395 N.W.2d 167 (quoting *Colton v. Foulkes,* 259 Wis. 142, 146, 47 N.W.2d 901 (1951)). Thus, in determining the standard of care for construction under a contract, the Wisconsin Supreme Court has treated tort and contract claims as interchangeable.

Further, the majority of jurisdictions that recognize an implied warranty of workmanlike performance in contracts between a builder/seller and a new homeowner employ a negligence standard to determine whether the performance was workmanlike. Moreover, like Wisconsin, they look to local industry practices to determine negligence. For example, in assessing whether a builder's performance satisfies the implied warranty of workmanlike performance, Texas courts ask whether the builder "construct[ed] the home in the same manner as would a generally proficient builder engaged in similar work and performing under similar circumstances." *Centex Homes,* 2001 WL 1946128, at \*5; *accord Wimmer,* 406 A.2d at 93 ("The test is one of reasonableness, not perfection, the standard being, ordinarily, the quality of work that would be done by a worker of average skill and intelligence."); *Becker v. Graber Builders., Inc.,* 149 N.C.App. 787, 561 S.E.2d 905, 909 (2002) (applying "the standard of work-

manlike quality then prevailing at the time and place of construction").

**b. Reasonably Adequate for Intended Use and Occupancy**

■ As discussed, the second warranty implied by § 706.10(7), that the premises are reasonably adequate for their intended use and occupancy, relates to the quality of the resulting property, not the builder's manner of performance. Thus, a showing of negligence by the builder or developer is not required. *See Centex Homes,* 2001 WL 1946128, at \*6 (quoting Davis, *supra,* at 1015); *see also Crowder v. Vandendeale,* 564 S.W.2d 879, 882 (Mo.1978), *overruled on other grounds by Sharp Bros. Contracting Co. v. Am. Hoist & Derrick Co.,* 703 S.W.2d 901 (Mo.1986).

The citation to *Earl Millikin, Inc. v. Allen,* 21 Wis.2d 497, 124 N.W.2d 651 (1963) in the legislative comment following § 706.10(7) suggests that the drafters intended that this be the rule in Wisconsin. In *Earl Milliken,* the court addressed a commercial tenant's obligation to pay rent to a builder/landlord for property to be used as a retail store even though the property had no water supply. The court said that the "[c]ovenant of possession [in the lease and construction agreement] implies not only that the tenant will be able to physically occupy the premises … but that he will also be able to use the premises for its intended purpose." *Id.* at 501, 124 N.W.2d 651. The building's intended purpose, use as a retail store, required a water supply for which the grantee had expressly contracted; thus, the landlord violated the covenant. *Id.* at 501–02, 124 N.W.2d 651. No showing of negligence was required.

The state court of appeals reached the same result in *Shisler,* where it found the builder liable for breach of an implied warranty of fitness based on flooding in the basements of the plaintiffs' new condominium units even though the trial court had

expressly declined to find that the builder had acted negligently. 1998 WL 255206, **5–6, 1998 Wisc.App. LEXIS 1546, at *14–15. The court of appeals focused only on the resulting condominium units and whether they were fit for occupancy, not the builder's manner of performance. *Id.* And, although *Shisler* is an unpublished decision, its analysis of Wisconsin law is thorough and its reasoning persuasive.

■ However, not every defect will violate this implied warranty. Rather, the defect must make the property not "reasonably adequate" for its intended "use and occupancy" and, thus, be so substantial that it undermines the essence of the parties' bargain. Wisconsin courts have interpreted an analogous warranty, the implied warranty of habitability in residential leases, to be violated only when defects were so substantial that they made the premises uninhabitable. In *Pines v. Perssion*, 14 Wis.2d 590, 111 N.W.2d 409 (1961), the state supreme court found that the landlord breached the implied warranty because the apartment was "not in a condition reasonably and decently fit for occupation" due to its "inadequate electrical wiring, kitchen sink and toilet in disrepair, furnace in disrepair, handrail on stairs in disrepair, screens on windows and doors lacking." *Id.* at 593–96, 111 N.W.2d 409. Similarly, in *Denham v. Madole*, 194 Wis. 583, 585, 217 N.W. 423 (1928), the court permitted a commercial tenant to abandon his basement billiard hall rental unit when leaking water and excessive moisture began causing damage to goods and the occupants' health.

Courts in other jurisdictions have also held that only substantial defects violate the implied warranty of fitness for new homes. *E.g., Gaito v. Auman*, 313 N.C. 243, 327 S.E.2d 870, 874 (1985) (stating that dwelling must be "sufficiently free from major structural defects"); *Centex Homes*, 2001 WL 1946128, at *6 (stating

that the warranty is breached by conditions that are "dangerous, hazardous, or detrimental to ... life or safety"); *Stuart v. Coldwell Banker Commercial Group, Inc.*, 109 Wash.2d 406, 745 P.2d 1284, 1289–90 (1987) (stating that warranty is breached by "structural and egregious" defects). Relatively minor defects—those that do not implicate the property's habitability or structural integrity—do not violate the implied warranty. *E.g., Aronsohn v. Mandara*, 98 N.J. 92, 484 A.2d 675, 681–82 (1984) (holding that defective patios did not breach the implied warranty of habitability); *Stuart*, 745 P.2d at 1289–90 (stating that walkways and decks which failed to meet water tightness requirements might not be sufficient to breach the implied warranty).

Whether a defect is substantial or not is not a precise determination. *See* Jean C. Love, *Landlord's Liability for Defective Premises: Caveat Lessee, Negligence, or Strict Liability*, 1975 Wis. L.Rev. 19, 101–02. Thus, in the context of residential rental units, the Wisconsin Supreme Court has considered whether the apartment complies with fundamental aspects of local housing codes. The *Pines* court relied heavily on the landlord's violation of local housing codes in concluding that the implied warranty of habitability had been breached. The court said,

> Legislative and administrative rules, such as the safe place statute, building codes and health regulations, all impose certain duties on a property owner with respect to the condition of the premises. Thus, the legislature has made a policy judgment—that it is socially (and politically) desirable to impose these duties on a property owner—which has rendered the old common law rule [of caveat emptor] obsolete.

*Pines*, 14 Wis.2d at 595–96, 111 N.W.2d 409. The court concluded that the land-

lord breached the implied warranty because the apartment did not comply with the housing code in several key respects—there was "inadequate electrical wiring, kitchen sink and toilet in disrepair, furnace in disrepair, handrail on stairs in disrepair, screens on windows and doors lacking." *Id.* at 596, 111 N.W.2d 409. Similarly, in *Diamond Homes, Inc. v. Bodovinac,* 42 Wis.2d 683, 691–92, 168 N.W.2d 75 (1969), the court relied on the builder's non-compliance with city grading requirements to hold it liable to the home-buyers for breach of contract.

Courts in other jurisdictions also treat local housing and building codes as a benchmark in determining whether a new home satisfies the implied warranty of fitness or habitability. *E.g., Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399, 402 (1964); *Vantage View, Inc. v. Bali E. Dev. Corp.,* 421 So.2d 728, 730 (Fla.Dist.Ct.App. 1982), *overruled on other grounds by Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114 (Fla.1984); *Schiro v. W.E. Gould & Co.,* 18 Ill.2d 538, 165 N.E.2d 286, 290–91 (1960); *Albrecht,* 767 N.E.2d at 47; *Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs.,* 799 P.2d at 258–60. Once again, however, not every deviation from a building code constitutes a breach. The violation must be fundamental to the habitability of the building. *Compare Schiro,* 165 N.E.2d at 290–91 (holding that violation of plumbing and sewage disposal routing requirements breached implied warranty) *and Atherton Condo. Apt.-Owners Ass'n,* 799 P.2d at 258–60 (holding that violation of fire code provision relating to construction of floors and ceilings could breach implied warranty) *with Stuart,* 745 P.2d at 1289–90 (holding that violation of water tightness requirements for walkways and decks might not be sufficient to breach warranty).

## 2. Application of Criteria to Plaintiff's Claims

### a. Facade

■ I conclude that with respect to the facade, a preponderance of the evidence shows that MRP breached the implied covenant of reasonable adequacy by conveying a structurally compromised building with a facade that was noncompliant with the local building code. As discussed, the evidence discloses that the facade had substantially deteriorated at least by January 2000 when MRP transferred control over the common areas of the Riverfront Lofts building to the Association. This defect made the Riverfront Lofts building not "reasonably adequate" for "use and occupancy."

Reasonable adequacy for use and occupancy requires, at a minimum, an intact structure. When conveyed, the facade was not intact. It had begun to chip off and separate from the building. Other courts have found similar defects to have breached the implied warranty of fitness. *See Hills of Palos Condo. Ass'n, Inc. v. I–Del, Inc.,* 255 Ill.App.3d 448, 193 Ill.Dec. 760, 626 N.E.2d 1311, 1326–27 (1993) (upholding jury verdict that spalling brick breached the implied warranty); *Elden v. Simmons,* 631 P.2d 739, 741–42 (Okla.1981) (stating that crumbling bricks could constitute breach); *Roy E. Thomas Constr. Co. v. Arbs,* 692 S.W.2d 926, 930–32 (Tex.App. 1985) (stating that cracks in bricks and foundation could constitute breach).

In addition, because of the spalling, the building was unsafe. Falling brick and terra cotta posed a risk to pedestrians on the west side of the building and caused the City of Milwaukee to cite the building for violating the City's building code and to order that a canopy be installed. The violation charged was not a minor one. The City charged that the building violated a code provision requiring a building's exterior surfaces to be "reasonably weath-

erproof, watertight ... [and] kept in a reasonably good state of maintenance and repair." Milwaukee, Wis. Building Code § 275–32–3 (2001). For this reason also, the building was not reasonably adequate for use and occupancy.

Moreover, the spalling affected not only the facade but compromised the integrity of the building. The separation of the masonry from the building permitted water to penetrate the building's structural frame. The facade's defects, thus, were not minor but rather were substantial. *See Stuart*, 745 P.2d at 1289–90 (stating that structural defects violate implied warranty).

Further, finding MRP liable for the defects in the facade furthers the purpose of the statutory covenant. MRP renovated the building inside and out and was thus in a better position than the buyers to discover and remedy the defects. *See Degnan*, 696 P.2d at 433 ("The theory behind the implied warranty ... recognizes that when either an innocent builder-vendor or an innocent buyer will suffer, the builder-vendor, as the one in the better position to have prevented the harm, shall be liable to the buyer for that harm."). In addition, the buyers had a right to expect that they would obtain the benefit of their bargain— a condominium unit in a building reasonably adequate to serve as a residence. The buyers reasonably expected that the building would be safe and intact. Their expectation imposed no unreasonable burden on the builder-vendor. Thus, a finding of liability enforces the bargain that the parties struck. *See Atherton Condo. Apt.-Owners Ass'n*, 799 P.2d at 259.

MRP argues that the implied covenant applies only to latent defects [7], and that the facade's problems were not latent but, rather, were visible. Other courts have held that implied warranties only apply to latent defects, meaning those that would not be apparent to the average buyer after viewing the property. *See Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324, 330 (1982); *Park v. Sohn*, 89 Ill.2d 453, 60 Ill.Dec. 609, 433 N.E.2d 651, 656 (1982); *Gupta v. Ritter Homes, Inc.*, 646 S.W.2d 168, 169 (Tex.1983); *Meadowbrook Condo. Ass'n*, 565 A.2d at 240.

However, even assuming that the implied covenant applies only to latent defects, MRP's argument fails because at the time of the conveyance the defects in the facade were latent. Although parts of the facade were visible, the average person would have been unable to conclude that substantial defects existed or would soon exist. This is so for several reasons. First, the building sits close to other buildings on its north and south sides, thus very little of the north and south faces is visible from the ground level. Second, to the east of the building is the Milwaukee River, thus the east face is only visible from across the river at a considerable distance. Third, the building is ten stories tall, and most of the facade's defects appeared high on the building. (*See* Trial Ex. 21 photographs at 1–4.) Even on the west side, where the view of the facade was unobstructed, the defects would not have been readily visible to someone standing on the ground. Grothman indicated as much in the Building Condition Survey when he recommended that MRP conduct a close-up inspection. Finally, the average buyer, inexperienced in building construction, would not have known that the cracked and chipped masonry that was visible was a sign of a serious defect that affected the structural integrity of the building. Thus, the defects in the facade are fairly characterized as latent.

---

7. The Wisconsin Supreme Court has held that express warranties in real estate contracts only cover latent defects. *See Dittman v. Na-* *gel*, 43 Wis.2d 155, 161–62, 168 N.W.2d 190 (1969).

MRP is liable to the Association for defects in the facade. The reasonable cost to repair such defects was $154,157. Thus, the Association is awarded $154,157 less the $2,200 paid by MRP to the Association as a special assessment, or the sum of $151,957.

**b. Soundproofing**

■ The Association also argues that MRP breached the implied covenant by failing to install proper sound-proofing. I consider first whether MRP's work was workmanlike and second, whether the lack of soundproofing made the property not reasonably adequate for use and occupancy.

The Association has not shown by a preponderance of the evidence that MRP's soundproofing failed to meet local industry standards and was, therefore, unworkmanlike. Dossett testified that, while placing the demising walls on top of the existing hardwood floors on floors five through seven resulted in easy sound travel, this procedure was typical in the industry. Indeed, he stated that he had never seen a builder renovating a structure with a hardwood floor do otherwise. He also testified that resting the hardwood floor on sleepers was the best way to construct a hardwood floor, and that it had little effect on the transmission of impact noise. The Association offered no evidence rebutting Dorsett's testimony. Thus, I conclude that the construction of the demising walls and floors on floors five through seven was not unworkmanlike.

As for floors eight through ten, where there were no existing hardwood floors, the Association established that MRP could have installed a sound-dampening pad or possibly constructed the floors and demising walls differently. However, the Association offered no evidence that local industry standards required MRP to do so.

Indeed, Dossett indicated that, at least with regard to the construction of the floor, the sleeper system was preferable to any other and the amount of soundproofing in the building was characteristic of that in buildings constructed in a loft-style.

Plaintiff relies on the testimony of Yerges regarding the units' FIIC ratings to demonstrate that the building fell below industry standards. However, the question before me is not whether the condominium units were loud, but whether MRP's construction was unworkmanlike. Yerges's testimony that some FIIC ratings were lower than fifty-five does not, without more, show that MRP's performance was unworkmanlike.

Plaintiff also showed that the sound of running water through pipes was transmitted among the units. However, Dossett testified that MRP installed rubber rings around the pipes to prevent the transmission of noise from pipes hitting each other, but that there was no way to prevent the transmission of noise from running water. The Association presented no evidence that local industry standards required MRP to do more. Thus, the Association's claim based on water noise is also rejected.

Next, I consider whether the alleged defects in sound-proofing made the building not reasonably adequate for its intended use and occupancy. I conclude that plaintiff has also not met its burden of proof on this issue. While the sound of footsteps and running water may be annoying, it did not make the building inadequate for use and occupancy as a residence. *See Putnam v. Roudebush*, 352 So.2d 908, 910 (Fla.Dist.Ct.App.1977) (holding that noise from an air conditioner did not make building uninhabitable); *Abrams v. Rapoport*, 516 N.E.2d 943, 946 (Ill.App.1987) (holding that noises emanating from building roof assembly during windy conditions did not make building uninhabitable). No witness testified to the

contrary. Further, Dossett testified that the noise from footsteps was largely ameliorated by a carpet. Thus, the breach of implied covenant claim relating to the soundproofing is rejected.

### c. Inaccessible Air Conditioners

■ Next I address whether MRP breached the implied covenant by installing some of the building's air conditioners so that they were inaccessible for cleaning, maintenance and repair. The evidence indicated that the air conditioning units on the second and fourth floors were installed only three to four inches apart and were inaccessible for even routine cleaning. Further, the evidence showed that the air conditioning units on floors five through ten, although accessible for routine cleaning, are not accessible for maintenance and repair. This is so because the air conditioners were placed on top of drywall or tile ceilings that contained no access panels.

■ Generally, expert testimony is needed to determine whether a manner of construction meets with industry standards and is, thus, workmanlike. *See Herkert v. Stauber*, 106 Wis.2d 545, 570, 317 N.W.2d 834 (1982). However, when an issue can be resolved by common sense, no such testimony is needed. *Id.* Here, the Association offered no expert testimony regarding industry standards of air conditioner installation.

However, Karoly testified that air conditioning units should be cleaned annually. Thus, common sense instructs that installation which makes such foreseeable cleaning impossible is not workmanlike. Counsel for MRP even acknowledged in his closing statement that the configuration of

the air conditioners on the second and fourth floors was "a problem." Therefore, MRP's installation of the units on floors two and four was not workmanlike and breached the implied covenant.

Finding that MRP is liable for improperly installing these air conditioners serves the purpose of § 706.10(7). The unit owners reasonably expected that the air conditioners would be accessible for foreseeable cleaning. Requiring that MRP's work satisfy this expectation imposes no unreasonable burden. MRP should have known of and corrected this problem, thus a finding of liability enforces the standard of ordinary care that the parties contemplated in striking their bargain.

■ The units on floors five through ten, which are accessible for cleaning, are another matter. The record contains no evidence as to whether or when such units will likely need maintenance and repair. Thus, the Association has not proven that the need for access is foreseeable; and common sense does not compel me to find that MRP's failure to install access panels to permit such access was unworkmanlike. The record further contains no evidence that the absence of such panels makes the property inadequate for use and occupancy. Therefore, the Association's claim based on the failure to install access panels is rejected.

■ MRP argues that it cannot be held liable for the inaccessibility of any of the air conditioners because they are part of the individually-owned condominium units, not the common elements, and because the Association has not proven that the affected condominium unit owners are in privity of contract with MRP.[8] I con-

---

8. MRP previously raised a privity argument in response to the Association's claims for damages resulting from defects in the common areas. Specifically, MRP argued that the Association could only recover damages in an amount proportional to the percentage of the common areas owned by residents in privity of contract with MRP. However, I previously determined that Wisconsin law permitted the

clude, however, that under the circumstances of this case, the state supreme court would not hold that the Association could recover damages only for defects that affected units whose owners were in privity with MRP.

Neither the language nor the purpose of § 706.10(7) suggests that the statutorily implied warranties cover only conveyances where the buyer and builder-vendor are in privity of contract. Like original buyers, subsequent buyers also rely on builders' superior knowledge and expertise relating to the structures that they construct and reasonably expect that their performance will be workmanlike. *See Redarowicz*, 65 Ill.Dec. 411, 441 N.E.2d at 330 ("The purpose of the warranty is to protect purchasers' expectations by holding builder-vendors accountable; we do not believe it is logical to arbitrarily limit that protection to the first purchaser of a new house."); *Terlinde v. Neely*, 275 S.C. 395, 271 S.E.2d 768, 769 (1980) ("The fact that the subsequent purchaser did not know the home builder, as did the original purchaser, does not negate the reality of the 'holding out' of the builder's expertise and reliance which occurs in the market place."); *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 736 (Wyo.1979) ("[A]ny reasoning which would arbitrarily interpose a first buyer as an obstruction to someone equally as deserving of recovery is incomprehensible."). Indeed, limiting a builder's liability according to how long the first buyer chooses to own the property would be arbitrary in light of the frequency with which people can be expected to move from one house to another. *Redarowicz*, 65 Ill.Dec. 411, 441 N.E.2d at 330 (holding that warranty should extend to subsequent purchasers in part because "[w]e are an increasingly mobile people").

In addition, in the present case it is reasonable not to impose a privity limitation because so little time passed between the initial conveyances and the resale of certain units. The units were first conveyed in 1998 and 1999 and resold in December 1999.[9] (*See* Trial Ex. 117.) It is not unreasonable to hold a builder responsible for performance that was unworkmanlike when the deficiency was discovered so soon after completion, regardless of who holds title to the property. *See Redarowicz*, 65 Ill.Dec. 411, 441 N.E.2d at 330 (stating that "[t]he compelling public policies underlying the implied warranty of habitability should not be frustrated because of the short intervening ownership of the first purchaser" and finding a time period of approximately one year insufficient to bar a claim by a subsequent purchaser).

Further, the Wisconsin Supreme Court has permitted recovery where there was no privity of contract in analogous situations when public policy concerns suggested that permitting recovery was appropriate. For example, in *A.E. Investment*

---

Association to recover 100% of the damages to common areas.

The evidence does not make clear which condominium units were affected by the installation problems. Concerning the air conditioners that were installed too close together, Karoly testified that the air conditioners themselves were on floors two and four, and that the problem affected twelve units. Each floor in the building has four units, thus, although the air conditioners themselves were on floors two and four, the units affected were on floors two, three and four. When plaintiff commenced this suit, two of the units had been resold. (Trial Ex. 117.) Thus, it appears that two of the owners on whose behalf the Association brought this action are not in privity of contract with MRP.

9. I consider only those sales which occurred before 2001 when Iron Fireman discovered the problem and moved the air conditioners because the Association brought the claim in order to recover for the costs it incurred during this period.

*Corp. v. Link Builders, Inc.,* 62 Wis.2d 479, 488, 214 N.W.2d 764 (1974), the court held that an architect who was negligent in designing a building could be liable to a third party with whom the architect was not in privity. *See also Citizens State Bank v. Timm, Schmidt & Co., S.C.,* 113 Wis.2d 376, 385, 335 N.W.2d 361 (1983) (holding that a certified public accounting firm could be liable for errors in an audit to a third party with whom the firm was not in privity).

Finally, the trend in the case law is to find that the implied warranty of habitability and workmanlike performance can be enforced by subsequent purchasers. *See* Sean M. O'Brien, *Caveat Venditor: A Case for Granting Subsequent Purchasers a Cause of Action Against Builder–Vendors for Latent Defects in the Home,* 20 J. Corp. L. 525, 534 (1995) ("Currently, at least fourteen states extend the implied warranty of habitability to subsequent purchasers."); Robert L. Cherry, Jr., *Builder Liability for Used Home Defects,* 18 Real Est. L.J. 115, 138 (1989) (noting that in the twelve years following the first decision extending the warranty to subsequent buyers, *Barnes v. Mac Brown & Co., Inc.,* 264 Ind. 227, 342 N.E.2d 619 (1976), seventeen jurisdictions have followed); *see also Redarowicz,* 65 Ill.Dec. 411, 441 N.E.2d at 330 (noting that the Uniform Land Transactions Act extends the implied warranty to subsequent purchasers); *Lempke v. Dagenais,* 130 N.H. 782, 547 A.2d 290, 293–94 (1988) (collecting cases from other jurisdictions); *Nichols v. R.R. Beaufort & Assocs., Inc.,* 727 A.2d 174, 179 (R.I.1999); *Gupta,* 646 S.W.2d at 169.

The parties have stipulated that it cost $12,100 to reconfigure the air conditioners on the second and fourth floors. Thus, I will award plaintiff damages in this amount.

#### d. Construction Dust and Debris

■ The Association's claim with regard to MRP's failure to clean up construction dust and debris will be rejected. The Association offered no evidence of industry standards regarding construction clean-up and failed to show how the debris comprised the use and occupancy of the building. Thus, the Association has not met its burden of showing either that MRP's performance was unworkmanlike or that the dust and debris made the building inadequate.

### C. Whether Covenant Was Disclaimed

■ MRP argues that even if its construction was unworkmanlike or caused the building to not be reasonably adequate, it cannot be held liable because in several documents provided to condominium owners it disclaimed liability. Under § 706.10(7) a covenant shall be implied "[i]n the absence of an express or necessarily implied provision to the contrary." Thus, the question presented is whether the language in the documents on which MRP relies constituted an express or necessarily implied provision to the contrary of implying a covenant.

In predicting how the state supreme court would answer this question, I begin with the words of the statute. "[E]xpress" means "directly and distinctly stated ... not dubious or ambiguous." *Webster's Third New International Dictionary* 803 (3d ed.1986). "[N]ecessarily" means "in such a way that it cannot be otherwise ... inevitably, unavoidably." *Id.* at 1510. "[C]ontrary" means "diametrically different[,] ... opposite in character or nature ... mutually opposed." *Id.* at 495. Therefore, an express or necessarily implied provision to the contrary is a direct, distinctly-stated, unambiguous provision stating that the covenant is not to be implied, or a provision that inevitably or in-

variably leads to the conclusion that the covenant is not to be implied.

Thus, the statute requires courts to imply the covenant unless there is a clear, unmistakable and unambiguous disclaimer. This rule is consistent with the law in most other states. A majority of states require disclaimers of implied warranties in new home sales to be "specific and unambiguous." *See* David L. Abney, *Disclaiming the Implied Real Estate Common–Law Warranties,* 17 Real Est. L.J. 141, 142–43 (Fall 1988) ("The majority rule is clear in stating that a disclaimer must be specific and unambiguous in order to be effective"); *see, e.g., See Starfish Condo. Ass'n v. Yorkridge Serv. Corp.,* 295 Md. 693, 458 A.2d 805, 810 (1983) (finding "as is" provision insufficient to waive implied warranty of habitability because provision did not expressly name the warranty).

The statute thus establishes a high standard for defendants relying on disclaimers. "To allow an easy disclaimer ... would place the buyer right back in the same position as having no implied [covenant] protection at all." Abney, *supra,* at 142. The legislature could not have intended this result. *See id.* at 142–51 (discussing the high standards courts have set for disclaiming implied warranties in new home sales). I consider each of MRP's three alleged disclaimers to determine whether it is sufficient.

First, MRP points to a document dated December 5, 1997, which was provided to purchasers with the condominium disclosure materials and Building Condition Survey prior to closing. This document stated as follows:

> As required by Section 703.33(2)(cm) of the Wisconsin Condominium Ownership Act with respect to conversion condominiums, the undersigned, being the Declarant of Riverfront Lofts Condominium, makes the following statements to each purchaser of a unit in Riverfront Lofts Condominium:
>
> 1. The present condition of those structural components and mechanical and electrical installations that are material to the use and enjoyment of the building in which the units in the Condominium are located is as set forth in the attached Building Condition Survey made by the independent engineering firm of Graef, Anhalt, Schloemer & Associates, dated December 1, 1997.
> 2. No representations are made by the Declarant regarding the expected useful life of any of the items described in the attached Building Condition Survey.
> 3. There are no uncured violations of building code or other municipal regulations with respect to the Condominium.

(Trial Ex. 110.) Specifically, MRP argues that the language in the second point constituted a valid disclaimer of the defects in the facade and of the improper installation of the air conditioners.

For several reasons, the Wisconsin Supreme Court would be unlikely to conclude that the statement on which MRP relies was sufficiently specific and unambiguous to constitute a valid disclaimer. First, the language did not "express[ly]" state that the covenant would not be implied because it did not mention the covenant. Further, the statement did not "necessarily impl[y]" that a covenant would not be implied because it did not address the matters covered by the covenant. Rather, it concerned a related but different issue than those addressed by the covenant. The language in point two addressed "the expected useful life" of the parts of the building described in the Building Condition Survey; whereas, the covenant addresses the workmanlike manner of the builder's performance and the adequacy of the

structure for certain uses. Nothing in the language of point two would have inevitably led to the conclusion that MRP was disclaiming its statutory obligations to perform in a workmanlike manner or to make the building reasonably adequate for use and occupancy.

Nor did the Building Condition Survey, which point two references, clearly and unambiguously disclaim the implied covenant. The Survey referred to the facade and the air conditioners but did not alert buyers to their defects. Thus, it also did not imply, much less "necessarily impl[y]" that the statutory covenant warranting that the building was not defective was being disclaimed. With regard to the facade, the Building Condition Survey described what Grothman could see and concluded that further inspection was necessary to determine whether there were significant problems. It did not describe the condition of the facade at that time with any degree of certainty, nor convey that it had serious structural defects. (*See* Trial Ex. 2 at 3–3, 3–5 to 3–7.) Thus, with regard to the facade, the survey did not disclaim the covenant.

With regard to the air conditioners, the Survey stated that they were "in good working order and require[d] no modifications," but it said nothing about how they were installed or whether they were accessible for maintenance and repair. (*Id.* at 4–2.) Thus, the Survey did not alert buyers to the fact that they were improperly installed on floors two and four and, therefore, cannot reasonably be characterized as a disclaimer of the statutory covenant warranting proper installation.

For the foregoing reasons, the language in point two of the condominium disclosure materials did not expressly or necessarily imply that the statutory covenant was being disclaimed.

The result would be the same under standards governing disclaimers developed by courts in other jurisdictions. Some courts hold that general disclaimers waiving all warranties are invalid. *E.g.*, *Wawak*, 449 S.W.2d at 926 (finding general language waiving all warranties insufficient to disclaim implied warranty of habitability). The statement in point two related to the entire property which is referenced in the Building Condition Survey. Thus, even if the statement could be construed as a disclaimer, it was so general that it probably would be found invalid under the *Wawak* standard.

Other courts hold that disclaimers containing boilerplate language are invalid. *Petersen*, 27 Ill.Dec. 746, 389 N.E.2d at 1159; *Crowder*, 564 S.W.2d at 881 n. 4. The statement in point two consisted solely of boilerplate language taken from Wisconsin's condominium disclosure statute. *See* Wis. Stat. § 703.33(2)(cm).

Some jurisdictions permit disclaimers only if the builder-vendor can show that the buyer actually knew of the defects, knew that the warranty was being disclaimed and knew the consequences of its exclusion. *See Belt v. Spencer*, 41 Colo. App. 227, 585 P.2d 922, 925 (1978); *Petersen*, 27 Ill.Dec. 746, 389 N.E.2d at 1159 (same); *Crowder*, 564 S.W.2d at 881 n. 4; *Centex Homes*, 2001 WL 1946128, at *7. MRP offers no such evidence here.

■ The second document which MRP claims included a disclaimer was the addendum to the offers to purchase. It stated that, "Seller [MRP] shall, at Seller's expense remedy any defects in workmanship or materials related to the Property for a period of one (1) year from the date of closing, provided Buyer gives written notice to Seller of any claimed defects within such one (1) year period. Construction industry standards shall be used to determine if any defects exist." (*See* Trial Ex. 1 ¶¶ 11 or 13.) However, this repre-

sentation does not meet the high statutory standard for disclaiming the covenant. The representation did not mention the covenant, thus, it did not "express[ly]" disclaim it. Further, the representation did not necessarily imply that the covenant was being disclaimed because it was compatible with the covenant rather than mutually exclusive.

A builder can warrant that it will repair defects discovered within one year of sale without disclaiming a promise that its performance will be workmanlike and that the building will be reasonably adequate when it is conveyed. The promise to make repairs does not preclude the promises implied by law. Indeed, the majority of courts to address this issue have concluded that "the presence of an express warranty is an added guarantee inserted into the contract to extend, rather than limit, liability for faulty construction" and, thus, does not disclaim implied warranties. *Bridges v. Ferrell*, 685 P.2d 409, 411 (Okla.App. 1984) (citing *Burton–Dixie Corp. v. Timothy McCarthy Constr. Co.*, 436 F.2d 405 (5th Cir.1971); *Hoagland v. Celebrity Homes, Inc.*, 40 Colo.App. 215, 572 P.2d 493 (1977); *Rapallo S., Inc. v. Jack Taylor Dev. Corp.*, 375 So.2d 587 (Fla.Dist.Ct.App. 1979); *Norair Eng'g Corp. v. St. Joseph's Hosp., Inc.*, 147 Ga.App. 595, 249 S.E.2d 642 (1978); *Richman v. Watel*, 565 S.W.2d 101 (Tex.Civ.App.1978), *aff'd*, 576 S.W.2d 779 (Tex.1978) (expressly declining to reach the issue)); *accord Hennes Erecting Co. v. Nat'l Union Fire Ins. Co.*, 813 F.2d 1074, 1081 (10th Cir.1987); *Cafro v. Brophy*, No. CV 9557138S, 1998 WL 279943, at *11 (Conn.Super. May 12, 1998), *rev'd on other grounds by* 62 Conn.App. 113, 774 A.2d 206 (2001); *see also Gilbane Bldg. Co. v. Ocean State Bldg. & Wrecking, Inc.*, 748 A.2d 826, 828 (R.I.2000).

■ Third, MRP argues that the integration clause in the offers to purchase expressed or necessarily implied that the statutory covenant would not be implied. The offers stated that they contained "the entire agreement of the Buyer and Seller regarding the transaction. All prior negotiations and discussions have been merged into this Offer." (Trial Ex. 16 at 3.) However, this language did not disclaim the covenant. Like the provisions discussed above, it did not mention the covenant and, thus, did not expressly disavow it. Further, it did not impliedly disclaim the covenant because the covenant applies by operation of law not as the result of "prior negotiations and discussions." Even assuming that the implied covenant was part of the parties' prior negotiations and discussions, the integration clause did not clearly and unambiguously disclaim it.

Other courts that have addressed the issue have concluded that an integration clause does not bar a claim for breach of an implied warranty. *See Griffin v. Wheeler–Leonard and Co., Inc.*, 290 N.C. 185, 225 S.E.2d 557, 567–68 (1976) (addressing agreement between home builder-seller and buyer); *Tyus v. Resta*, 328 Pa.Super. 11, 476 A.2d 427, 434–35 (1984) (same); *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 355 (Tex.1987) (same); *see also U.S. Gypsum Co. v. Schiavo Bros., Inc.*, 450 F.Supp. 1291, 1304 (E.D.Pa.1978) (addressing commercial-landlord tenant relationship), *aff'd on this issue by* 668 F.2d 172, 175–76 (3d Cir.1981).

For the foregoing reasons, none of the documents relied on by MRP constituted an "express or necessarily implied provision to the contrary" of the statutory language making the covenant part of the parties' agreement.[10]

---

**10.** Even if one of the documents on which MRP relies did constitute a valid disclaimer of the implied covenant, MRP would arguably be liable under the provision in the addenda requiring it to repair defects discovered with-

## III. DAMAGES FOR BREACH REGARDING HALLWAYS AND STAIRWELLS

Lastly, I address the Association's damages for MRP's failure to complete work in the hallways and stairwells as required by the Krawczyk closing agreement. A plaintiff has the burden to prove damages "with a reasonable degree of certainty." *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 189, 557 N.W.2d 67 (1996). The evidence of damages must be sufficient to enable the fact-finder "to make a fair and reasonable approximation." *Id.*

The only evidence in the record with respect to the cost of completing the unfinished work identified in the agreement appears in the agreement itself. House Doctor's lump sum bid for unspecified work is insufficiently specific to help me determine the cost of completing the work described in the agreement. The Association urges me to rely on Dossett's testimony that he thought that he had estimated the cost of finishing the stairway landings and painting the walls at $40,000. However, Dossett admitted that he could not recall with certainty what he bid. In addition, it is not clear that Dossett's estimate covers the same work as that required by the Krawczyk closing agreement. The latter required MRP to "complete main and east stairwells including floors, trim and walls," remove a telephone box and wiring and clean the slate stairs at an estimated cost of $3,000. (Trial Ex. 4 ¶ G.) The difference between the $3,000 listed in the contract and Dossett's estimate is so great as to suggest that the parties may not have been talking about the same work. Thus, Dossett's testimony is also insufficiently certain to provide a basis for assessing damages. I am left with the amounts listed in paragraphs F, G and H of the Krawczyk closing agreement. I will award the Association damages totaling $8,000 based on those figures.

## IV. CONCLUSION

THEREFORE, THE COURT FINDS defendant Milwaukee / Riverfront Properties L.P. liable to plaintiff Riverfront Lofts Condominium Owners Association for breach of the covenant implied by Wis. Stat. § 706.10(7) with respect to defects in the facade and in the installation of air conditioners on the second and fourth floors. Plaintiff's breach of implied covenant claims with respect to defects in soundproofing, in the installation of air conditioners on the fifth through tenth floors and in the clean-up of construction debris are rejected.

IT IS ORDERED that defendant pay to plaintiff damages as follows:

The amount of $151,957 for defects in the building facade;

The amount of $12,100 for installing air conditioners too close together on the second and fourth floors; and

The amount of $8,000 for completion of the work described in paragraphs F, G and H of the Krawczyk closing agreement.

FINALLY, IT IS ORDERED that the Clerk of Court enter judgment for plaintiff

---

in one year of closing. This provision was included in every conveyance and at least five conveyances closed within one year of the discovery of the defects in the facade. The record does not indicate on exactly what date the Association asked MRP to perform the facade repair work but does reveal that the request came sometime between September 22, 2000 when the City issued a notice of violation and January 2001 when Thomas Holton inspected the building. Sales of condominium units closed on February 28, March 29 and 30, April 17 and September 1, 2000. (Trial Ex. 117.) However, I need not address this issue because I find that MRP did not disclaim the implied covenant, and because the parties have not addressed it.

and against defendant in the amount of $172,057.